*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CHEVRON U.S.A., INC., | ) | |
| CONOCOPHILLIPS ALASKA, INC., | ) | Supreme Court No. S-15891 |
| EXXONMOBIL ALASKA | ) | |
| PRODUCTION INC., and FOREST | ) | Superior Court No. 3AN-13-04430 CI |
| OIL CORPORATION, | ) | |
| | ) | O P I N I O N |
| Appellants, | ) | |
| v. | ) | No. 7142 – December 16, 2016 |
| | ) | |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Michael D. Corey, Judge.

Appearances: Leon T. Vance, Faulkner Banfield, P.C., Juneau, for Appellants. Dario Borghesan, Kenneth J. Diemer, Joanne M. Grace, Assistant Attorneys General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

STOWERS, Chief Justice.

## I. INTRODUCTION

In this appeal oil producers (the Producers)[1] challenge an administrative decision (the Decision) in which the Alaska Department of Revenue (DOR) decided to treat separate oil and gas fields operated by common working interest owners as a single entity when calculating the Producers' oil production tax obligations. Relying on a statute that gave DOR the discretion to "aggregate two or more leases or properties (or portions of them), for purposes of determining [their effective tax rate], when economically interdependent oil or gas production operations are not confined to a single lease or property,"[2] DOR concluded that operations on a number of smaller oil fields were economically interdependent with larger operations on the adjacent Prudhoe Bay oil field. The Producers argue that in interpreting the phrase "economically interdependent" in the Decision, DOR effectively promulgated a regulation without following the procedures established in the Alaska Administrative Procedure Act (APA)[3] and, as a result, DOR's Decision was invalid. We conclude that DOR's Decision was not a regulation because it was a commonsense interpretation of the statute and, therefore, DOR was not required to comply with APA rulemaking requirements. We affirm the superior court's decision upholding DOR's decision.

---

[1]    The Producers involved in this appeal are Chevron U.S.A., Inc., ConocoPhillips Alaska, Inc., ExxonMobil Alaska Production Inc., and Forest Oil Corporation.

[2]    Former AS 43.55.013(j) (2005).

[3]    AS 44.62.180-290.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

#### 1.    An overview of Alaska's taxes on oil production

The Prudhoe Bay oil field is one of the largest oil and gas fields yet discovered in the United States.  Explorers discovered the Prudhoe Bay oil field in 1967 and the field began producing oil about ten years later.  Just as oil production began in Prudhoe Bay, Alaska passed the initial version of the Oil and Gas Production Tax, which laid out a new system for taxing oil production in Alaska.[4]  During the relevant time frame this legislation set the production tax rate for oil fields by multiplying a constant nominal tax rate of 15% by the economic limit factor (ELF), a coefficient between zero and one calculated for each individual oil field.[5]  In other words, a higher ELF resulted in a higher tax rate, and a lower ELF resulted in a lower tax rate for any given oil field.

The legislature passed House Bill 118 in 1989, adding the "field size factor" as a component of the ELF formula.  The field size factor is the total volume of production from a field during a given reporting month.[6]  All else being equal, the field

---

[4]    *See* former AS 43.55.011(a) (2005).  In August 2006 the legislature amended this statute and eliminated the key provisions at issue in this case.  The legislature made these changes effective retroactively to April 1, 2006.  Ch. 2, §§ 34, 39 TSSLA 2006.  This appeal only concerns events that took place before April 1, 2006, so we cite to AS 43.55.011 and the associated regulations as they existed during the time frame relevant to this appeal.

[5]    Former AS 43.55.011(a) (2005) ("The tax is equal to . . . the percentage-of-value amount calculated under (b) of this section . . . multiplied by the economic limit factor determined for the oil production of the lease or property under AS 43.55.013.").

[6]    *See* former AS 43.55.011 (2005); former AS 43.55.013 (2005).  The oil ELF formula was:

$$(1-(PEL \,/\, TP))^{(150{,}000/(TP/Days))^{((460(WD))/PEL)}}$$

(continued...)

size factor produced a higher ELF (and therefore a higher tax rate) for larger fields and a lower ELF (and therefore a lower tax rate) for smaller fields. The legislature reasoned that smaller fields needed similar production infrastructure to larger fields but, because they produced less oil, smaller fields had poor economies of scale and were less profitable.[7] The legislature hoped that including the field size factor in the ELF formula

---

[6]      (...continued)
"PEL" represents the monthly production rate at the economic limit; "TP" represents the field's total volume of production during a reporting month; "WD" represents the total number of well days, or days the well operates, during the month; and "Days" is the number of days in the month. The first exponent in this equation is commonly known as the "field size factor."

[7]      As the legislature contemplated adding the field size factor to the ELF formula through House Bill 118, the DOR Commissioner at the time, Hugh Malone, described the reason behind the proposed change to the Speaker of the House in a letter dated March 21, 1989. This letter stated that

> [t]here are many economies of scale realized as a result of larger field size. For instance, each field, regardless of size, still would require the following: operations center, base camp, airstrip, roads, warehouse, power plant, drill pads, sewage treatment, water storage, transportation support vehicles, gas conditioning and compression facility, oil/gas/water separation plant, flow station, waterflood facility, water injection facility, dehydration plant, and so forth.

ConocoPhillips Alaska, Inc. used a similar rationale to advocate for the proposed change in a letter to members of the House Resources Committee dated February 7, 1989. The letter stated that

> [a]ll fields, regardless of size, must possess living quarters, roads, pipelines, and personnel transportation infrastructure in addition to the normal production handling facilities. In Alaska's high cost environment, these factors result in significant diseconomies of scale for smaller fields. For

(continued...)

would create an economic incentive for oil producers to develop marginal fields that they would otherwise shut down or neglect for economic reasons.[8]

However, including the field size factor in the ELF formula also created an incentive for oil producers to capitalize on tax breaks for smaller fields by classifying certain areas as independent fields even if the areas were economically interdependent with other, larger oil fields. Therefore, AS 43.55.013(j) (the Aggregation Statute) permitted DOR to aggregate two or more fields for the purpose of calculating the ELF "when economically interdependent oil or gas production operations are not confined to a single lease or property."[9] Aggregating several fields into a single field for the purpose of calculating the ELF increased the field size factor and, by extension, increased both the ELF and the tax rate for these aggregated fields above what the ELF and the tax rate would have been for the individual areas. Whether DOR could aggregate the fields in

---

[7]  (...continued)
smaller fields to be economically developed, we believe some adjustments must be made in the tax or royalty structure.

[8]  During a House Resources Committee meeting discussing House Bill 118, House Speaker Sam Cotten explained that House Bill 118 "would encourage development in some of the smaller fields. It would reduce taxes in some of those areas that are so marginal that that might actually make a difference whether they go into production." *Transcription of House Resource Committee Meeting, House Bill No. 118 - ELF*, Hearing on H.B. 118 Before the H. Res. Comm., 16th Leg., 1st Sess. 3 (Feb. 9, 1989) (statement of Sam Cotten, H. Speaker, H.R.). And DOR's Sectional Analysis of House Bill 118 stated that "[t]he current ELF is not giving Alaska an attractive enough tax climate to encourage development of marginal oil fields. . . . House Bill 118 would target tax breaks toward marginal fields . . . ."

[9]  Former AS 43.55.013(j) (2005) ("The department may aggregate two or more leases or properties (or portions of them), for purposes of determining economic limit factors under this section and applying them to AS 43.55.011 or AS 43.55.016, when economically interdependent oil or gas production operations are not confined to a single lease or property.").

question depended on whether the fields were "economically interdependent." However, the legislature never defined this term in the production tax statutes, and DOR never defined the term in related regulations.

To eliminate uncertainty whether DOR would aggregate particular fields, DOR adopted 15 Alaska Administrative Code 55.027(b), a regulation permitting producers to petition for assurance that DOR would not aggregate specific oil fields for the purpose of calculating the ELF.[10] To obtain this guarantee, producers had to show that (1) using common production facilities would lower the costs of production; (2) DOR's guarantee would increase the likelihood that producers would develop a new field; (3) oil would be accurately allocated; and (4) "operations . . . would not be economically interdependent in the absence of the proposed use of common production facilities."[11] However, proving these factors did not guarantee an advance ruling because DOR had the discretion to aggregate or to decline to do so.[12] As with other related regulations, 15 AAC 55.027(b) also did not define "economically interdependent."[13]

In August 2006 the legislature repealed the ELF-based tax system and replaced it with a new production tax system, effective retroactively to April 1, 2006.[14]

---

[10] 15 AAC 55.027(b) (eff. 1/1/95) (repealed 2007). This regulation was repealed in 2007, but it was in effect during the relevant time period in this case. We cite to the regulation as it appeared during the relevant time period.

[11] *Id.*

[12] *Id.* ("Upon application of a producer . . . the department will, in its discretion, issue an advance ruling that the department will not aggregate specified leases or properties for purposes of determining economic limit factors . . . .").

[13] *Id.*; 15 AAC 55.900 (am. 1/1/04).

[14] Ch. 2, §§ 34, 39 TSSLA 2006.

### 2. Oil production at Prudhoe Bay

Before beginning production at Prudhoe Bay, the working interest owners of the field's oil and gas leases combined those leases into a unit called the Prudhoe Bay Unit so that the working interest owners could conduct operations as if the entire unit area were a single lease. The Alaska Department of Natural Resources approved the creation of two separate Participating Areas within the Prudhoe Bay Unit; we refer to them jointly as the Initial Participating Areas (Initial PAs).[15] Participating areas are made up of multiple lease tracts that participate in the production of hydrocarbons. The owner of each individual lease tract receives a certain percentage of the total production of all the wells drilled in that participating area. For tax purposes producers typically treat a participating area as a single lease or property when calculating production taxes, and DOR has typically accepted this characterization.

At the start, the two Participating Areas making up the Initial PAs were divided such that one area produced oil and the other produced gas.[16] In 1986 the

---

[15] *See* 11 AAC 83.351(a) (2005) ("At least 90 days before sustained unit production from a reservoir, the unit operator shall submit to the commissioner for approval a description of the proposed participating area, based on subdivisions of the public land or its aliquot parts. The participating area may include only the land reasonably known to be underlain by hydrocarbons and known or reasonably estimated through use of geological, geophysical, or engineering data to be capable of producing or contributing to production of hydrocarbons in paying quantities. . . . Under 11 AAC 83.371(a), the unit operator also shall submit to the commissioner for approval of a proposed division of interest or formula setting out the percentage of production and costs to be allocated to each lease or portion of lease within the participating area. Upon approval by the commissioner, the area of productivity constitutes a participating area.").

[16] Later, ownership interests in the Prudhoe Bay Unit realigned such that each working interest owner had rights to a single percentage interest in both oil and gas in the combined reservoirs of the Prudhoe Bay Unit. This realignment of ownership essentially made the Initial PAs "the equivalent of a single participating area." Thus, we

(continued...)

Department of Natural Resources approved an additional participating area on a separate reservoir, known as the Lisburne Participating Area (Lisburne PA). The working interest owners built a separate set of production facilities to handle production from the Lisburne PA.

Later, the working interest owners identified nine additional reservoirs within the Prudhoe Bay Unit, and the Department of Natural Resources approved separate participating areas for each of these nine reservoirs.[17] Six of these nine participating areas are involved in this appeal, and we refer to these areas as the "Satellite PAs."[18] The Satellite PAs covered separate reservoirs, were developed long after the development of the Initial PAs, and produced significantly smaller oil outputs than the Initial PAs. The Satellite PAs integrated operations with the Initial PAs, because, unlike the Lisburne PA, the Satellite PAs did not have their own production facilities.[19] Instead, production facilities originally built to serve both the Initial PAs also processed the fluids

---

[16]    (...continued)
refer to them jointly as "the Initial PAs" in this opinion.

[17]    These nine areas were the Aurora, Borealis, Midnight Sun, Niakuk, North Prudhoe Bay, Orion, Pt. McIntyre, Polaris, and West Beach Participating Areas. Some documents refer to the Pt. McIntyre Participating Area as N. McIntyre, but we use Pt. McIntyre to refer to the area in question to remain consistent with DOR's Decision.

[18]    The participating areas involved in this appeal are those that DOR aggregated with the Initial PAs. These areas include the Aurora, Borealis, Midnight Sun, Orion, Polaris, and Pt. McIntyre Participating Areas. The Producers involved in this appeal owned working interests in the Prudhoe Bay Unit during the relevant period, February 1, 2005 through March 31, 2006. These working interests included working interests in the two Initial PAs, the Lisburne PA, and the Satellite PAs.

[19]    Lisburne PA production facilities initially processed production from Pt. McIntyre, one of the Satellite PAs, but in 2004, Initial PA facilities began processing a portion of production from Pt. McIntyre as well.

produced at the Satellite PAs.[20]

Until oil and gas are separated from one another and from any waste present in the well fluids, producers cannot accurately measure oil and gas output. Therefore, the measurement of production typically takes place downstream of the production facilities. In this case measurement of output from the production facilities serving the Initial PAs and the Satellite PAs took place at pump station number one of the Trans-Alaska Pipeline System. The working interest owners attributed total metered volume to various properties based on estimates of each well's production as determined by periodic tests of the wells.

Furthermore, the amount of oil developed from each participating area depended on the amount and quality of oil produced at the others. Because the centralized production facilities serving the Initial PAs and the Satellite PAs could not process all production from all wells in those participating areas, fluids from some wells were "backed out," or blocked, in favor of fluids from other wells based on the "best well produces" principle. This principle favored well fluids with the highest ratio of oil to gas, which were ultimately the most profitable fluids to produce, regardless of their participating area of origin and regardless of which working interest owner owned that participating area.

---

[20] Well fluids include gas, oil, and water. The Satellite PAs sent their well fluid to centralized production facilities originally built to serve the Initial PAs. There, fluids from the Satellite PAs commingled with fluids from the Initial PAs. Six coordinated processing centers processed the commingled fluids, separating crude oil from the other well fluids and using small pipelines to deliver the oil to pump station number one of the Trans-Alaska Pipeline System. The processing centers sent the separated natural gas to a central gas facility to further separate natural gas liquids from the natural gas. Some of the natural gas liquids were blended back into the crude oil or taken in kind as natural gas liquids, while the rest were sent to the central compression plant for re-injection into the reservoirs.

In the Prudhoe Bay Unit, each Satellite PA had a smaller field size factor and therefore a lower ELF than the Initial PAs. Consequently, while DOR taxed production from the Initial PAs at a rate of about 12.5%, DOR taxed production from the Satellite PAs at a rate of less than 0.5%. Furthermore, the older Initial PA wells tended to produce more gas and water per barrel of oil than wells in the Satellite PAs. Therefore, lower-tax oil from the Satellite PAs backed out higher-tax oil from the Initial PA wells at increasing rates. The number of barrels of Initial PA production backed out in favor of Satellite PA production increased substantially from 217,896 barrels in 2000 to 1,224,090 barrels in 2004. As the low-tax oil from the Satellite PAs increasingly backed out the high-tax oil from the Initial PAs, the total amount of tax DOR collected from the Prudhoe Bay Unit decreased accordingly.

The Producers sought advance rulings from DOR that it would not aggregate several Satellite PAs that used Initial PA production facilities. Between August 1998 and November 2001 the Producers filed multiple requests for advance rulings involving the Aurora, Borealis, Midnight Sun, and Polaris Participating Areas. As early as 2000 DOR informed the Producers that it was examining the issue, but it never acted on these applications. During that time period DOR considered the requests and conducted internal analyses on the best way to clarify the phrase "economic interdependence" as it was used in the Aggregation Statute.[21]

### 3. DOR's internal analyses of the Aggregation Statute

DOR produced a variety of internal memoranda and internal departmental position papers acknowledging confusion over the interpretation of "economic interdependence" and analyzing whether it would be better to clarify the term via statute, regulation, or administrative decision. In August 2001, Dan E. Dickinson, the Director

---

[21] Former AS 43.55.013(j) (2005). *See supra* note 9 and accompanying text.

of DOR's Tax Division (the Director) prepared an internal memorandum expressing concern that the Aggregation Statute did not clearly define the grounds for aggregation and that the then-existing regulations did not remedy the confusion. The Director complained that "[t]he ELF is difficult to administer because the base criteria for aggregation and segregation are not clearly articulated in the statute. . . . [O]ur attempts to further clarify the criteria in the regulations are self-contradictory and have not dispelled the murkiness." In particular, the Director was concerned that a straightforward reading of the term "economically interdependent" would permit aggregation only if the fields were "*mutually* contingent," (emphasis added) preventing DOR from aggregating older fields and satellite fields relying on the production facilities originally built to serve only those older fields, the situation DOR faced with regard to the Initial PAs and the Satellite PAs. The Director wrote that DOR

> may aggregate [fields] when they are economically interdependent. Going to Webster suggests that [DOR] must show that the [fields] are "mutually contingent" before [DOR] aggregate[s]. The argument can always be made that as long as new production comes on and uses empty space in old production facilities, there is no mutual dependency.

The Director suggested that DOR could repeal 15 AAC 55.027(b) and adopt new regulations evaluating economic interdependence using analytical factors. The Director believed that the use of his suggested analytical factors would represent "a 180-degree switch in the roles played by production facilities in the ELF decision." In May 2002 the Director issued a separate internal memorandum proposing adding new provisions to 15 AAC 55.027 that would take production constraints in common production facilities into account when interpreting the phrase "economic interdependence" as it was used in the Aggregation Statute.

While DOR never adopted those proposed regulations, it continued to

internally discuss the need for clarification. The Director began drafting a departmental position paper (the White Paper) on the application of the Aggregation Statute, particularly the meaning of "economic interdependence." August and September 2002 versions of the White Paper draft suggested that the term "economically interdependent" as it was used in the Aggregation Statute was ambiguous, theorized that DOR could change its "established reading" of the statute to a "better, alternative reading of the law" that could "turn the current ELF practice on its head," and suggested that such changes would be so extensive that they should probably occur through legislation rather than regulation.

Shortly after the completion of the September 2002 White Paper draft, the Director acknowledged that upcoming advance ruling decisions, which were likely to result in the "granting of separate ELFs," would provide an opportunity to clarify the Aggregation Statute's reference to economic interdependence. However, he expressed doubt that DOR should use the decisions to change the existing interpretation of the statute and stated that DOR "do[es] not inten[d] to amend that policy without either (a) legislative direction or (b) encountering a factual situation that is so egregious that to preserve any measure of original legislative intent it becomes necessary for us to act."

In subsequent drafts of the White Paper circulated internally from February 2003 to November 2004, DOR continued to explore options for addressing its concerns about the interpretation of the phrase "economic interdependence." In the February 2003 draft DOR suggested that these changes to ELF policy "should [be] . . . enshrined in a regulation." The White Paper also pointed out that DOR "ha[s] the power through regulation . . . to raise an additional 100 million dollars a year in taxes by changing course and raising taxes on the [Satellite PAs]."

A March 2003 draft of the White Paper again stressed the need to clarify the statutory standard through the adoption of regulations, emphasizing that "the

definition of economic interdependence . . . [is] sufficiently vague in statute that [DOR] ought to adopt regulations to clarify the definition." The draft recognized the policy implications of such a decision, explaining that DOR likely "has the discretion through regulation to either validate its current practices, or take a much more aggressive revenue stance." In its analysis of the then-current policy, DOR acknowledged that one of the primary dictionary definitions of the term "interdependence" involved mutual dependence, which could require each field to be contingent upon the existence of the other before DOR could aggregate the fields. The draft reasoned that under this definition, the Satellite PAs and the Initial PAs could not be economically interdependent because the Initial PAs were developed long before and independently of the Satellite PAs, and, therefore, the Initial PAs could not be contingent upon the Satellite PAs. This March 2003 draft also explored alternative interpretations of "economic interdependence" that would produce different results when applied to the Prudhoe Bay Unit. The draft concluded this analysis by recognizing that the "words and concepts" of the Aggregation Statute "are not well defined."

Finally, the August 2004 draft, seeming to assume that DOR would proceed via regulation — the White Paper draft discussed what would happen "[o]nce the regulations are written," for instance — presented various alternative interpretations of the Aggregation Statute, one of which required mutual contingence for interdependence to be found. A November 2004 draft of the White Paper repeated this line of reasoning, but it also mentioned that DOR was planning to aggregate some of the Satellite PAs with the Initial PAs.

## B.    Proceedings

In January 2005 the Director issued DOR's Decision notifying the Producers that DOR had decided to aggregate the Initial PAs and the Satellite PAs in the

Prudhoe Bay Unit[22] for the purpose of calculating production tax obligations effective February 1, 2005, the start of a new monthly period for determining production tax obligations.[23] DOR found that operations at the Initial PAs and the Satellite PAs were economically interdependent, and, therefore, DOR aggregated them, referencing a variety of policy reasons for its decision. The Decision effectively treated the aggregated areas as a single lease or property for calculating the ELF, resulting in a higher ELF and a higher tax rate on the oil produced from these properties.

The Decision explained that DOR's prior administrative decisions related to aggregation provided "only limited guidance" on the meaning of the term "economically interdependent." The Decision then reviewed judicial decisions analyzing the term in other legal contexts in jurisdictions outside of Alaska and a 1998 DOR decision in which DOR aggregated multiple leases covering a single reservoir developed under a sole management plan. DOR concluded that "while the guidance provided by past administrative precedent is sparse, the applicable generality . . . seems to be that economic interdependence is shown by or associated with unified or integrated operations or enterprise encompassing the several leases or properties in question."

Based on that review, DOR's Decision stated that "if [fields] are so integrated as to be reasonably treated as an economically unitary activity," the fields are economically interdependent. DOR further explained that a "weak" form of economic interdependence "exists between two or more things when the economic activity or

---

[22]    The Decision aggregated the Aurora, Borealis, Midnight Sun, Orion, Polaris, and Pt. McIntyre Participating Areas with the Initial PAs. The superior court's statement that the Lisburne and Niakuk Participating Areas were also aggregated is not correct. Aggregation changed the production tax obligations for all four of the Producers and for BP Exploration (Alaska) Inc.

[23]    *See* former AS 43.55.020(a) (2005) (providing that oil production taxes should be paid on a monthly basis).

condition of each has a material effect on the economic activity or condition of the other" and a "strong" form of economic interdependence "exists when formally distinct entities or activities are sufficiently economically integrated that for some practical purpose they may reasonably be considered as equivalent to a single or unitary economic entity or activity." DOR observed that these two concepts often, if not always, "differ . . . only in the degree of interdependence that exists."

DOR did not decide which standard controlled for the purposes of the Aggregation Statute. However, DOR concluded that the areas in question easily satisfied the more demanding standard because (1) the Initial PAs and the Satellite PAs shared common production facilities for oil and gas, and the use of common facilities made the volume of oil produced from any participating area dependent on the volume of oil produced from the others; (2) the working interest owners made decisions about which wells to produce and which wells to back out "across participating areas, not within each participating area on an isolated basis"; and (3) "the commingling of produced fluids in common production facilities and the consequent need to estimate and allocate volumes from different [participating areas] renders the production volumes of all the [participating areas] interdependent."

DOR then explained the policy rationale behind its Decision. First, DOR concluded that "the backout phenomenon, taken together with highly disparate economic limit factors as between the Initial PAs and the [S]atellite PAs, results in a tax structure that is grossly at odds with the economics of oil production." DOR explained that the legislature intended the ELF system to serve as a tax break for costlier production, but in Prudhoe Bay, non-aggregation gave a tax break to oil from the Satellite PAs even though that oil was less costly to produce due to its higher ratio of oil to gas than the oil from the Initial PAs. Second, due to the rising cost of oil in recent years, oil production on all Prudhoe Bay fields was moving further away from its economic limit; therefore,

increasing the tax rate on oil from the Satellite PAs would not discourage the Producers from continuing to produce oil from the Satellite PAs. Third, DOR believed "[i]t [was] inherently problematical to tax oil at widely differing effective rates when the determination of how much oil is subject to which rate is based not on accurate metering but on estimation." DOR acknowledged that it had approved the use of allocation in previous instances of facility sharing but that "its subsequent experience ha[d] not been without significant problems." Finally, based on the history of North Slope development, DOR found "little reason to believe" that declining to aggregate the Satellite PAs with the Initial PAs in the Prudhoe Bay Unit would "promot[e] additional development."

DOR concluded its Decision by determining that the Satellite PAs in question were eligible for aggregation with the Initial PAs, relying on factors including the use of common production facilities, the coordination of well production to deal with constrained capacity in shared production facilities, the use of backout volume and compensation arrangements, and the allocation of production to wells without exact metering.

In March 2005 the Producers appealed the Decision[24] and requested an

---

[24] *See* 15 AAC 05.001-05.050 (governing appeal procedures related to tax matters under AS 43).

informal conference with DOR under AS 43.05.240(a)[25] and 15 AAC 05.020(a).[26]  In November 2008 after the informal conference, DOR affirmed its earlier decision.

Pursuant to AS 43.05.241[27] and AS 43.05.405[28] the Producers then appealed to the Office of Administrative Hearings, where Administrative Law Judge Christopher Kennedy presided over the appeal.  At the administrative hearing the Producers argued that DOR's Decision violated the Administrative Procedure Act and

---

[25]    AS 43.05.240(a) ("A taxpayer aggrieved by the action of the department in fixing the amount of a tax or penalty may apply to the department within 60 days after the date of mailing of the notice required to be given to the taxpayer by the department, giving notice of the grievance, and requesting an informal conference to be scheduled with an appeals officer.").  BP Exploration (Alaska) Inc. participated in the informal conference, but it did not participate in subsequent appeals.

[26]    15 AAC 05.020(a) ("Upon receipt of a written request for appeal under 15 AAC 05.010 requesting an informal conference, an appeals officer will promptly schedule the informal conference. . . .  The informal conference will be conducted in person, through correspondence, or by telephone, audio, or video teleconference, or other electronic means.  The appeals officer shall make available to the person who filed the request for appeal the relevant portion of that person's file, and shall explain at the informal conference the action taken by the department.  A person who wants to present facts and information in support of its position must bring all pertinent books, records, schedules, and other documents to the conference. . . .  The person who filed the request shall supply additional information that the appeals officer considers necessary.").

[27]    AS 43.05.241 ("For a matter within the jurisdiction of the office of administrative hearings (AS 44.64) under AS 43.05.405, the taxpayer aggrieved by an informal conference decision entered under AS 43.05.240 may file with the office of administrative hearings a notice of appeal for formal hearing, as provided in AS 43.05.430, no later than 30 days after service of the decision resulting from an informal conference.").

[28]    AS 43.05.405 ("The office has original jurisdiction to hear formal appeals from informal conference decisions of the Department of Revenue under AS 43.05.240. Appeal to the office may be taken only from an informal conference decision under AS 43.05.240.").

the Producers' due process rights. The Producers maintained that DOR should have implemented any changes to its interpretation of the relevant statutes by proper rulemaking under the APA, not through its decision process. In support of their arguments, the Producers relied heavily on DOR's internal documents, which the Producers had acquired from DOR during the informal conference process.

Judge Kennedy's decision acknowledged that the internal memoranda and White Paper drafts "suggest that the question of how to interpret 'economically interdependent' and other phrases in the ELF statute could have been approached by asking the legislature for clarifying amendments or by adopting an interpretive regulation[], and that the department considered those options," but that "[a]s preliminary, informal, internal, confidential, and generally unattributed papers, the[y] . . . show nothing more." In October 2012 Judge Kennedy upheld DOR's decision and concluded that DOR was not required to engage in formal rulemaking in interpreting the Aggregation Statute the way it did in its Decision.

The Producers then appealed Judge Kennedy's decision to the superior court, again raising APA and due process arguments. In March 2015 Superior Court Judge Michael D. Corey held that DOR had adopted a commonsense interpretation of the Aggregation Statute that did not require formal rulemaking under the APA. The court also held that DOR did not abuse its discretion or violate the Producers' due process rights.

The Producers appeal to this court. The Producers claim that DOR's Decision constitutes a regulation and, since a regulation adopted without complying with the APA is invalid,[29] the Decision itself is invalid. The Producers argue that DOR should

---

[29] *Friends of Willow Lake, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Aviation & Airports*, 280 P.3d 542, 548-49 (Alaska 2012) (citing *Smart v. State,*
(continued...)

recalculate the production tax for the period from February 2005 through March 2006 and refund any amounts the Producers paid in excess of the recalculated production tax for that period with interest.

## III. STANDARD OF REVIEW

"Whether an agency action is a regulation is a question of law that does not involve agency expertise, which we review applying our independent judgment."[30] Therefore, "more deferential standards of review sometimes reserved for agency interpretations are inappropriate here" where "[t]he threshold question . . . is whether the APA applies" to DOR's action.[31]

## IV. DISCUSSION

**A. DOR's Decision Applying The Term "Economically Interdependent" To The Initial PAs and Satellite PAs Was A Commonsense Interpretation Of The Statute And Did Not Trigger APA Rulemaking Requirements.**

**1. Defining a regulation under Alaska law**

The APA defines a regulation as "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the

---

[29]    (...continued)
*Dep't of Health & Soc. Servs.*, 237 P.3d 1010, 1017 (Alaska 2010)).

[30]    *State, Dep't of Nat. Res. v. Nondalton Tribal Council*, 268 P.3d 293, 299 (Alaska 2012) (citing *Alyeska Pipeline Serv. Co. v. State, Dep't of Envtl. Conservation*, 145 P.3d 561, 564 (Alaska 2006)).

[31]    *Id.* (first alteration in original) (quoting *Jerrel v. State, Dep't of Nat. Res.*, 999 P.2d 138, 141 (Alaska 2000)).

law enforced or administered by it."[32]  Regulations that are not promulgated under APA procedures are invalid.[33]

"[T]he label placed on a particular statement by an administrative agency does not determine the applicability of the APA.  Under the Alaska statute, 'regulation' encompasses many statements made by administrative agencies, including policies and guides to enforcement."[34]  But while the APA's definition of regulation is construed broadly,[35] not every agency action or decision constitutes a regulation.[36]  An agency action must meet both of the following criteria to be a regulation: (1) "the [agency action] implements, interprets, or makes specific the law enforced or administered by the agency"; and (2) "the [agency action] affects the public or is used by the agency in dealing with the public."[37]  An agency action must satisfy both prongs in order for APA rulemaking requirements to apply to that action.

In analyzing whether an agency action was adopted "to implement, interpret, or make specific the law enforced or administered by it"[38] we have recognized

---

[32]    AS 44.62.640(a)(3).

[33]    *Friends of Willow Lake, Inc.*, 280 P.3d at 548-49 (citing *Smart*, 237 P.3d at 1017).

[34]    *Kenai Peninsula Fisherman's Coop. Ass'n v. State*, 628 P.2d 897, 905 (Alaska 1981).

[35]    *Friends of Willow Lake, Inc.*, 280 P.3d at 549 (quoting *Smart*, 237 P.3d at 1017).

[36]    *Nondalton Tribal Council*, 268 P.3d at 300 (quoting *Kachemak Bay Watch, Inc. v. Noah*, 935 P.2d 816, 825 (Alaska 1997)).

[37]    *Id*. at 300-01.

[38]    AS 44.62.640(a)(3); *see also Nondalton Tribal Council*, 268 P.3d at 300-

that agencies must have some freedom to apply relevant statutes without the burden of adopting a regulation each time they do so. We have explained that "[n]early every agency action is based, implicitly or explicitly, on an interpretation of a statute or regulation authorizing it to act. A requirement that each such interpretation be preceded by rulemaking would result in complete ossification of the regulatory state."[39]

Therefore, we have clarified that agency actions that are merely "[commonsense] interpretation[s]" of existing requirements are not regulations requiring compliance with APA rulemaking standards.[40] In other words, "obvious, commonsense interpretations of statutes do not require [rulemaking]."[41] We have further explained that

---

[38] (...continued)
01.

[39] *Alyeska Pipeline Serv. Co. v. State, Dep't of Envtl. Conservation*, 145 P.3d 561, 573 (Alaska 2006).

[40] *Alaska Ctr. for the Env't v. State*, 80 P.3d 231, 243-44 (Alaska 2003) (holding that an agency interpretation "[did] not satisfy the Administrative Procedure Act's definition of 'regulation,' as it was not an 'amendment, supplement, or revision of a rule, regulation, order, or standard' so much as it was a [commonsense] interpretation of the regulation's applicability" because "[i]t neither provided new requirements nor made the existing ones any more specific," and concluding that the agency interpretation "thus was not a 'regulation' and did not need to be promulgated in accordance with the Alaska Administrative Procedure Act." (internal citations omitted)).

[41] *Alyeska Pipeline Serv. Co.*, 145 P.3d at 573. The Producers characterize this holding — that "obvious, commonsense interpretations of statutes do not require rulemaking" — as an exception to the definition of a regulation set forth in the APA. The Producers use this characterization to argue that the exception does not apply to DOR's Decision because (1) Alaska courts only — or at least predominantly — apply the exception in cases where an agency is interpreting its own regulations, as opposed to legislation and (2) even where Alaska courts have applied the commonsense exception to situations where an agency interpreted a statute directly, as opposed to interpreting its own regulation, Alaska courts have only done so when the agency's "interpretation
(continued...)

agency actions may not be "commonsense interpretations" of existing laws (1) when the agency adds "requirements of substance" and does more than just "interpret[] . . . the [statute] according to its own terms"; (2) when the agency interprets a statute in a way that is "expansive or unforeseeable"; or (3) when the agency "alters its previous

---

**41** (...continued)
was . . . routine." But the commonsense "exception" is not an exception at all; rather it is the rule, clarifying when an agency action is not a regulation. And apart from the Producers' incorrect characterization of the commonsense language as an exception, the Producers' arguments that the commonsense language does not apply to the case at hand are not persuasive.

The Producers cite *Friends of Willow Lake, Inc. v. State, Department of Transportation & Public Facilities, Division of Aviation & Airports*, 280 P.3d 542 (Alaska 2012), *Smart v. State, Department of Health & Social Services*, 237 P.3d 1010 (Alaska 2010), and *Alaska Center for the Environment v. State*, 80 P.3d 231 (Alaska 2003) in support of their proposition that Alaska courts only — or at least predominantly — apply the commonsense language to cases where an agency has already interpreted a statute through regulation. But we have specifically stated that "obvious, commonsense interpretations of *statutes* do not require rulemaking." *Alyeska Pipeline Serv. Co.*, 145 P.3d at 573 (emphasis added). Notably, we did *not* state that "obvious, commonsense interpretations of *regulations based on statutes* do not require rulemaking," and we did not qualify this statement in any other way that would suggest that we exclusively or even predominantly apply the commonsense language to cases where an agency has already interpreted a statute through regulation.

Second, the Producers argue that even where Alaska courts have applied the commonsense "exception" to situations where an agency interpreted a statute directly, as opposed to interpreting the agency's own regulation, Alaska courts have only done so when the agency's "interpretation was . . . routine." But whether the challenged interpretation was "routine" is not a factor courts must analyze when determining whether an agency action is a regulation under the APA's definition of a regulation or relevant case law. The Producers merely use the word "routine" to attempt to distinguish this case from those they cite in support of their argument, such as *Squires v. Alaska Board of Architects, Engineers & Land Surveyors*, 205 P.3d 326 (Alaska 2009) and *Alaska Center for the Environment v. State*, 80 P.3d 231 (Alaska 2003).

interpretation of a statute."[42]

### 2. DOR interpreted the Aggregation Statute according to its own terms.

An agency action may not be a commonsense interpretation of existing law when it adds "requirements of substance" rather than serving as an "interpretation of the [statute] according to its own terms."[43] In its Decision, DOR determined that oil production operations are economically interdependent when they are "so integrated as to be reasonably treated as an economically unitary activity." Comparing our previous decisions in *Jerrel v. State, Department of Natural Resources*[44] and *Burke v. Houston NANA LLC*[45] with *Alaska Center for the Environment v. State*[46] and *Alyeska Pipeline Service Company v. State, Department of Environmental Conservation*,[47] we conclude that DOR's Decision was a commonsense interpretation of the statute according to its own terms, and DOR's interpretation does not add any requirements of substance.

In *Jerrel*, the Jerrels held grazing leases on state land subject to a statute and its implementing regulation requiring them to mark their horses that grazed on the leased land.[48] The Department of Natural Resources sent a letter informing the Jerrels that they were not in compliance with the statute, which required that the livestock owners "tag[],

---

[42] *Alyeska Pipeline Serv. Co.*, 145 P.3d at 573 (quoting *Alaska Ctr. for the Env't*, 80 P.3d at 244).

[43] *Id*. (quoting *Alaska Ctr. for the Env't*, 80 P.3d at 244).

[44] 999 P.2d 138 (Alaska 2000).

[45] 222 P.3d 851 (Alaska 2010).

[46] 80 P.3d 231.

[47] 145 P.3d 561.

[48] *Jerrel*, 999 P.2d at 142.

dye[], or otherwise mark[]" their animals.[49]   The Department of Natural Resources directed them to mark their animals with "[sufficiently] permanent" markings visible from at least twenty feet, even though neither the statute nor relevant regulations contained that specific requirement.[50] We rejected the agency's argument that a twenty-foot requirement was an informal "policy rule," concluding that the requirement was a regulation developed "precisely in order to interpret, make specific, and implement the statutory requirement that a mark or brand 'show[] distinctly.' "[51]

Similarly, in *Burke*, we held that an agency's action was a regulation when that agency decided that its filing deadline's exemption for extenuating circumstances included an unwritten "discovery rule" that capped the grace period at ninety days.[52]  In both *Jerrel* and *Burke*, the agency action in question added specific criteria or values that clarified the existing statutory or regulatory standard and required the public to comport with precise criteria not specified in existing rules.  In other words, the agencies' actions in *Jerrel* and *Burke* added requirements of substance and, therefore, we held that the agencies' actions were regulations.

In contrast, in *Alaska Center for the Environment*, an agency clarified that the term "major energy facility" as used in a regulation did not include an airport expansion project because the regulation was not meant to include businesses that used fuel incidentally in daily operations.[53]  We held that the agency's interpretation was a

---

[49]    *Id.*

[50]    *Id*. at 142-43.

[51]    *Id*. at 143 (alteration in original) (quoting AS 03.40.020).

[52]    *Burke v. Houston NANA LLC*, 222 P.3d 851, 868-69 (Alaska 2010).

[53]    *Alaska Ctr. for the Env't v. State*, 80 P.3d 231, 242-44 (Alaska 2003).

commonsense interpretation of the statute that did not require rulemaking under the APA.[54]  In *Alaska Center for the Environment*, the agency did not add anything to the existing rule; it merely interpreted a broad phrase and decided whether a certain type of project was included in the definition of "major energy facility."  Similarly, in *Alyeska Pipeline Service Company*, an agency concluded that a statute authorizing it to recoup costs of reviewing air quality permit applications from the applicant included the costs the agency incurred in defending related permit appeals.[55]  We held that the agency's decision was a commonsense interpretation under the terms of the statute, not a regulation.[56]  In other words, the agency did not add anything to the statute; it merely clarified whether costs related to the defense of permit appeals fell under the broad umbrella of "costs," as that term was used in the statute.

In this case, DOR's Decision is more similar to the agencies' actions in *Alaska Center for the Environment* and *Alyeska Pipeline Service Company* than to the agencies' actions in *Jerrel* and *Burke*.  DOR clarified the scope of the statute by indicating the degree of economic interdependence that could warrant aggregation, but it did not add any specific criteria to the term "economically interdependent" that went beyond the scope of the Aggregation Statute's existing language.  Instead, DOR's Decision was based only on existing statutory language, and the Decision served only to clarify whether the broad term "economically interdependent" covered the specific situation involving the Satellite PAs and the Initial PAs.  Notably, the interpretation of "economically interdependent" set forth in DOR's Decision does not do much to clarify

---

[54]     *Id*. at 244.

[55]     *Alyeska Pipeline Serv. Co. v. State, Dep't of Envtl. Conservation*, 145 P.3d 561, 563, 572 (Alaska 2006).

[56]     *Id*. at 573.

the Aggregation Statute until that interpretation is applied to the specific facts of this case. This suggests that DOR narrowly tailored its interpretation of the phrase "economically interdependent" to the facts of this case and applied the existing language of the Aggregation Statute to this case without adding any additional terms.

DOR acknowledged in its White Paper drafts that there were a variety of possible definitions of "economically interdependent" based on dictionary definitions of related terms. The Producers argue the decisions by the superior court and the Office of Administrative Hearings "ignore completely the confusion and wildly different valid interpretations that DOR acknowledged, and the effort it expended over several years evaluating alternative interpretations different from the one obtained by looking at the primary dictionary definition." The Producers claim that this "demonstrates that it achieved the desired interpretation through considerable, complicated effort, not through a routine, [commonsense] interpretation of clear statutory language." The Producers also fault DOR for failing to cite any of the dictionary definitions related to the phrase "economically interdependent" in its Decision.

But it is not uncommon for there to be multiple ways to read a given phrase in a statute without adding any additional substantive terms or requirements; if this were not the case, agencies would always be required to proceed via rulemaking. Furthermore, DOR's interpretation of "economic interdependence" is consistent with dictionary definitions of the terms. Webster's Dictionary defines "inter-" as a prefix meaning "reciprocal."[57] It defines "dependent" as "determined or conditioned by another" and "dependence" as "the quality or state of being influenced or determined by

---

[57] *Inter-*, WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998).

or subject to another."[58]  DOR's determination that oil production operations may be economically interdependent "if [fields] are so integrated as to be reasonably treated as an economically unitary activity" is consistent with these definitions.[59]  In *Smart v. State, Department of Health & Social Services*, we held that an agency, in selecting one of several definitions of the term "statistically valid sampling methodologies" to use in selecting a "statewide sample" of a group of service providers for auditing, did not impose new substantive requirements because the agency chose its interpretation from an array of approaches laid out in published sources like statistics books.[60]  Just as the agency in *Smart* chose from among various established definitions of a broad phrase, DOR internally reviewed dictionary definitions relating to the phrase "economic interdependence" and interpreted the broad phrase in the Aggregation Statute based on these established definitions.  In doing so DOR did not add anything to the Aggregation Statute that was not present in the statute's existing language.

### 3. DOR's interpretation of the term "economically interdependent" was foreseeable.

The legislature enacted the ELF tax regime and gave DOR the discretion to aggregate oil fields in order to accomplish its main purpose:  to tax different oil fields at different rates to reflect each field's underlying economics and to incentivize oil

---

[58]     *Dependent*, WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998).

[59]     "Reciprocal" means "shared, felt, or shown by both sides."  *Reciprocal*, WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998).  DOR's reference to "economically *unitary* activity" (emphasis added) is consistent with this meaning, in that DOR views fields engaged in shared economic activity as economically interdependent.  And DOR's reference to "integrated" fields is consistent with the fields being "determined or conditioned" by each other or "being influenced or determined by or subject to" each other.

[60]     237 P.3d 1010, 1012, 1017-18 (Alaska 2010).

production in smaller, less profitable fields. When oil and gas operations in different fields become integrated such that there is no meaningful separation between production in the different fields, there is no justification for maintaining different effective tax rates on those fields. The Initial PAs and the Satellite PAs used common production facilities, coordinated well production to deal with constrained capacity in shared production facilities, implemented backout and compensation agreements based on the interconnections between the Initial PAs and the Satellite PAs, and allocated production to wells without exact metering. This meant that the Satellite PAs received tax breaks that were designed to alleviate costs they did not face, and the Satellite PAs began to back out oil taxed at the higher rate. DOR's Decision to interpret "economically interdependent" such that "economic substance . . . prevail[ed] over form" should therefore have been foreseeable in light of the ELF tax regime and the well-known purposes behind it; DOR's Decision was consistent with the legislature's intent. What *had* changed was the way in which the Producers increasingly integrated their operations among the Initial PAs and the Satellite PAs. It was foreseeable that DOR would use the tool the legislature gave it — its discretionary ability to aggregate fields if they were economically interdependent — to aggregate the Satellite PAs with the Initial PAs to better reflect the economic realities of the Prudhoe Bay Unit.

### 4. DOR's decision did not depart from a previous interpretation of the Aggregation Statute.

The Producers rely mainly on internal DOR memoranda and White Paper drafts to argue that "DOR's extended internal analysis of the [A]ggregation [S]tatute and the then-existing interpretation of and policy under that statute" demonstrate that "the Decision . . . altered DOR's prior interpretation of the statute." The Producers highlight the fact that in one memo, the Director acknowledged that an interpretation of the Aggregation Statute similar to DOR's interpretation in its Decision represented a

"180-degree switch in the roles played by production facilities in the ELF decision."[61] In another 2002 draft, the Director wrote that "two very different — almost opposite — interpretations can be drawn from" the ELF statute and that DOR supports an "alternative reading of the law" that would "turn the current ELF practice over on its head."[62] While these comments may offer weak support for the Producers' arguments,

---

[61] DOR convincingly asserts that this statement was a mistake because that memo incorrectly assumed that 15 AAC 55.027(b) *prohibited* DOR from aggregating operations if " 'production operations on the respective leases or properties would not be economically interdependent in the absence of the proposed use of common production facilities,' when in fact the regulation merely gave the agency the discretion not to aggregate properties in that situation." (quoting 15 AAC 55.027(b)). Administrative Law Judge Kennedy noted that "[a]nalysis in some of the documents is very preliminary and rough, reflecting confusion" and, regarding the Director's statement, agreed that

> Mr. Dickinson seems to have been under the impression that 15 AAC 55.027(b) *prohibited* the department from aggregating [participating areas] if they would not be economically interdependent in the absence of common production facilities. This is a reading of 15 AAC 55.027(b) that is sufficiently unsupportable that the [Producers] themselves have abandoned it in this appeal.

[62] Looking at the White Paper as a whole, it is not entirely clear that these comments are referring to DOR's interpretation of "economically interdependent." Instead, a close reading of these comments in context suggests that they may address issues related to alternative readings of the term "lease or property" or, more broadly, to alternative readings of the statutory purpose guiding DOR's exercise of its discretion whether to continue taxing small fields lightly to encourage development or to aggregate the smaller fields in order to better reflect the realities of oil production in certain areas. DOR explains that "producers have generally treated each participating area as a lease or property for the purposes of calculating oil and gas production taxes, and [DOR] has generally accepted this treatment." But the internal documents suggest that DOR was considering changing this approach. The Director's comments, at best, offer only weak support for a conclusion that the Decision represented a departure from DOR's previous

(continued...)

the Producers also cite portions of documents where the Director wrote, "Going to Webster suggests that we must show that the [leases or properties] are 'mutually contingent' before we aggregate" and that based on dictionary definitions, "[t]he argument can always be made that as long as new production comes on and uses empty space in old production facilities, there is no mutual dependency." But even considering these quotes, we conclude that the character of this evidence, the internal documents as a whole, and DOR's reasoning within its Decision demonstrate that DOR's Decision was not a departure from its previous interpretation of the Aggregation Statute.

First, these documents were never meant to represent DOR's official policy positions.[63] These documents were internal, and DOR clearly labeled them as drafts. Thus, an official decision, such as DOR's Decision, that reaches a conclusion different from those reached in internal White Paper drafts or memoranda does not represent a change in official policy that requires rulemaking because the internal documents never purported to set forth DOR's official position on the interpretation of the Aggregation Statute. Relying on these internal documents as evidence of DOR's previous interpretations of the Aggregation Statute under the facts of this case would be problematic because agency officials would fear that any written materials, even internal ones, could invalidate later official actions that differed from initial, non-public approaches. This would dissuade agency officials from conducting important internal written analyses and examining policy issues from all sides while in the process of

---

[62]    (...continued)
interpretations of the phrase "economically interdependent" in the Aggregation Statute.

[63]    The Producers concede that they "do not claim that the [internal] documents established DOR's official position or policy." They do, however, claim that the internal documents serve as evidence that DOR "for years wrestled with the problems presented by the statutory standard and a [commonsense] interpretation of it."

establishing the agency's official position on vital administrative matters.

Second, the internal documents as a whole do not suggest that DOR's Decision represented a departure from DOR's previous interpretations of the Aggregation Statute's use of the phrase "economically interdependent." At most, the internal documents suggest that the term "economically interdependent" is subject to more than one commonsense reading. But the mere fact that a term can be interpreted in more than one way does not automatically mean that rulemaking is required or that DOR changed its interpretation of the Aggregation Statute.[64] In multiple internal documents, DOR concluded that the Satellite PAs and the Initial PAs were not economically interdependent under one of the definitions of interdependence it found in the dictionary. But DOR also noted that within the same dictionary, other listed definitions for the same terms yielded different interpretations of economic interdependence that supported aggregation of the Satellite PAs and the Initial PAs.

Third, the Producers fail to cite or describe earlier decisions addressing aggregation, much less demonstrate how DOR's Decision was inconsistent with precedent. Most importantly, the Producers themselves admit that the Decision was the first time DOR formally addressed the meaning of the term "economically interdependent." DOR's interpretation could not have changed if this was, as both parties agree, the first time DOR was called upon to articulate its understanding of the term.

Furthermore, in reaching its Decision, DOR carefully reviewed its own administrative precedent surrounding the Aggregation Statute. It found that early decisions were "not particularly informative" but that they did "contain a common

---

[64] *See Alyeska Pipeline Serv. Co. v. State, Dep't of Envtl. Conservation*, 145 P.3d 561 (Alaska 2006); *Alaska Ctr. for the Env't v. State*, 80 P.3d 231 (Alaska 2003).

factual predicate that logically supports a finding of economic interdependence, namely, that a single operator manages the production operations." DOR also analyzed a 1998 decision aggregating multiple leases covering a single reservoir developed under a sole management plan. DOR acknowledged that the 1998 decision focused on development history in deciding whether to aggregate, but it clarified that it took that approach because the agency was aggregating the leases for a *retroactive* determination of tax burdens. DOR determined that "insofar as the question of economic interdependence of current or future production operations is concerned, the manner in which development previously occurred may not necessarily be of much relevance." After closely reviewing past precedent, DOR concluded that "while the guidance provided by past administrative precedent is sparse, the applicable generality . . . seems to be that economic interdependence is shown by or associated with unified or integrated operations or enterprise encompassing the several leases or properties in question." Rather than disavowing precedent, DOR looked to its past decisions and interpretations of the Aggregation Statute and determined that its interpretation of "economically interdependent" as meaning "so integrated as to be reasonably treated as an economically unitary activity" did not conflict and was consistent with its prior decisions.

Overall, while DOR may have changed the way it exercised its discretion in deciding to aggregate, this was the first time that DOR had been called upon to articulate its understanding of the phrase "economically interdependent," and its analysis in the Decision was not inconsistent with related, but not entirely analogous, precedent. Instead, DOR observed changing realities in the Prudhoe Bay Unit and decided to aggregate increasingly interdependent operations.

**B. The Producers Had An Opportunity To Be Heard Throughout The Proceedings.**

Although the Producers dropped their argument that DOR violated their

right to due process by issuing its Decision, we note that we have explained that in agency decision-making contexts, due process requires an opportunity to be heard.[65] We note that the Producers had a fair opportunity to be heard and to challenge DOR's interpretation of "economic interdependence" throughout these proceedings. After DOR issued its Decision, the Producers appealed the Decision and requested an informal conference with DOR under AS 43.05.240(a) and 15 AAC 05.020(a). After DOR affirmed the Decision, the Producers appealed to the Office of Administrative Hearings pursuant to AS 43.05.241 and AS 43.05.405. The Producers then appealed the administrative law judge's decision to the superior court.

During oral argument to this court, the Producers admitted that "[t]he [Producers] did have an opportunity to challenge [DOR's] interpretation," but they argued that they did not have the opportunity to challenge the interpretation "in the context of a clean slate the way there would be with the discussion of a regulation . . . . Instead of going through the public regulation process where anybody could participate, any interested party could state what their concerns were, now you're just dealing with the arguments about the application." The Producers argued that they did not have the opportunity to propose a better interpretation of "economic interdependence" and that, instead, they were confined to arguing that DOR's interpretation was "an impermissible, irrational interpretation." However, the Producers fail to articulate what they would have argued during the process of adopting a regulation that they did not argue during these various proceedings, and they agree that their

---

[65] *Amerada Hess Pipeline Corp. v. Alaska Pub. Utils. Comm'n*, 711 P.2d 1170, 1178 (Alaska 1986) ("While we endorse the judicial bridling of excessive administrative discretion by requiring guiding regulations, we will only do so to the extent necessary to assure a fair administrative process. Thus, we will not reverse an administrative adjudication on procedural due process grounds unless there exists an element of unfairness, vagueness or lack of notice or opportunity to be heard.").

arguments during these proceedings included arguments for alternative definitions of the phrase "economic interdependence." We conclude that during each stage of the proceedings, the Producers were able to set forth their preferred alternative definition of the phrase "economic interdependence," satisfying their right to be heard.

## V.     CONCLUSION

We AFFIRM the superior court's conclusion that DOR's Decision was not a regulation but instead was a commonsense interpretation of the Aggregation Statute. We also AFFIRM the superior court's decision upholding DOR's Decision.