*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TREVOR J. STEFANO, | ) | |
| | ) | Supreme Court No. S-18226 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-19-02522 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF CORRECTIONS, and EARL | ) | No. 7675 – December 8, 2023 |
| HOUSER, in an official capacity, | ) | |
| | ) | |
| Appellees. | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kristen C. Stohler, Judge.

Appearances: Trevor Stefano, pro se, Palmer, Appellant. Anna L. Marquez, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellees.

Before: Maassen, Chief Justice, and Carney, Borghesan, and Henderson, Justices. [Pate, Justice, not participating.]

BORGHESAN, Justice.

I.     INTRODUCTION

Regulations adopted by the Department of Corrections make a prisoner eligible for furlough within three years of the prisoner's "firm release date." The regulations also define what counts as a "firm release date": "the date on which a

prisoner is scheduled to be released, as established by . . . parole board action."[1] In 2016 the Department decided that this definition of "firm release date" includes the date the Parole Board sets for an inmate's release on discretionary parole. But in 2019 the Department decided that a discretionary parole release date does not count as a "firm release date."

A prisoner who was no longer eligible for furlough because of this change sued the Department. He argued the change in policy violated the Administrative Procedures Act (APA) because it amounted to revising a regulation without going through the APA's rulemaking process. The superior court granted summary judgment to the Department. The court concluded that the changed definition was merely a commonsense interpretation of existing regulation, so formal rulemaking was not required. Commonsense or not, the Department's most recent definition of "firm release date" is a *changed* interpretation of existing regulation that had to be adopted through rulemaking. Because it was not, we reverse and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

### A. Relevant Statutes And Regulations

Understanding this appeal requires familiarity with two different statutory schemes for prisoner release: (1) discretionary parole and (2) discretionary furlough.

Discretionary *parole* is administered by the Parole Board.[2] Prisoners who meet the statutory eligibility criteria may apply for discretionary parole.[3] Their applications are then evaluated by the Board, which considers different criteria to

---

[1] 22 Alaska Administrative Code (AAC) 05.660(a)(18).

[2] The Board of Parole is an entity within the Department of Corrections that reviews prisoner applications for discretionary parole. AS 33.16.020(a); AS 33.16.060(a)(2); AS 33.16.100.

[3] AS 33.16.090.

determine if the prisoner should be released on discretionary parole.[4] The steps for this procedure are prescribed in statute.[5] Once the Board votes to release the prisoner on discretionary parole on a specific date, the Board must follow the same procedural steps to revoke or amend that decision.[6]

Discretionary *furlough* is administered by the Department of Corrections. Some eligibility criteria for discretionary furlough are established in statute, and the legislature delegated authority to the Department to adopt additional criteria for discretionary furlough in regulation.[7] The Department has done so.[8] These regulations provide, among other things, that a prisoner with a sentence of more than one year is eligible for discretionary furlough only if the prisoner is "within three years or less of the firm release date."[9] The regulations also define "firm release date" as "the date on which a prisoner is scheduled to be released, as established by statutory good time calculation, court order, or parole board action."[10]

## B. Facts

In 2016 the Parole Board granted discretionary parole to Trevor Stefano, an inmate in the Department's custody. He was to be released on a certain date in 2021. Under the Department's policy at the time, this discretionary parole date was considered a "firm release date," which qualified Stefano to apply for discretionary furlough.

---

[4]     AS 33.16.100(a)(1)-(4).

[5]     AS 33.16.130.

[6]     AS 33.16.100(b) (giving prisoners right to formal hearing before Parole Board may "rescind or revise [a] previously granted parole release date").

[7]     *See, e.g.*, AS 33.30.111(d) (setting a mandatory requirement for discretionary furlough eligibility); AS 33.30.101 (directing the Department of Corrections Commissioner to create regulations for discretionary furlough program).

[8]     22 AAC 05.321.

[9]     22 AAC 05.321(c)(2).

[10]    22 AAC 05.660(a)(18).

Stefano was released on furlough with electronic monitoring in 2018. In 2019 Stefano was remanded back to custody. He again applied for discretionary furlough with electronic monitoring, again relying on his discretionary parole release date for eligibility. However, before he applied for release, the Department had announced that it would no longer consider the date of release on discretionary parole a "firm release date" for purposes of furlough eligibility. The Department denied Stefano's request for furlough. Stefano then filed an administrative grievance challenging this denial, which was also denied.

### C.    Proceedings

Stefano filed a complaint in the superior court alleging that the Department's policy change violated the APA. Stefano argued that the Department had changed the regulatory definition of "firm release date" — specifically, by narrowing the definition to exclude discretionary parole release dates — without following the APA's rulemaking procedures. In support of his complaint, Stefano attached (1) a formal Department of Corrections memorandum from 2016, which stated that "firm release date" included discretionary parole release dates and (2) an email sent in 2019 by the Department's Deputy Chief Classification Officer announcing that "firm release date" would no longer include a date of release on discretionary parole.

The State filed an answer admitting that the Department changed its policies to exclude discretionary parole release dates from the definition of "firm release date" but denying that this change violated the APA. The parties cross-moved for summary judgment. Both parties agreed that (1) the term "firm release date" is defined by regulation; (2) from 2016 to 2019 the Department considered an inmate's discretionary parole release date to be a "firm release date;" (3) Stefano was released in 2018 based on the Department's then-existing policy; and (4) the Department stopped considering an inmate's discretionary parole release date to be a "firm release date" in 2019. But the parties disagreed about whether this change required rulemaking under the APA.

The superior court granted summary judgment for the Department because it concluded the policy change did not require rulemaking. The court emphasized the discretionary nature of furlough decisions. The court reasoned that the Department's policy of not treating discretionary parole as a " '*firm* release date' reflects a common sense interpretation of [the regulation] according to its own terms," which does not require rulemaking.

Stefano moved for reconsideration. Stefano argued that the superior court had misunderstood the "firmness" of a discretionary parole release date. He explained that when the Parole Board orders that a prisoner may be released on discretionary parole on a certain date, that release date cannot be changed unless the Board votes to do so. Stefano argued that an inmate's date of release on discretionary parole was substantially more "firm" than the court had understood.

The court denied reconsideration. It did not address Stefano's argument about the nature of a grant of discretionary parole. Instead it detailed the procedural history of the case before concluding that "[o]n the record before it, the court finds no error that would entitle Stefano to reconsideration."

## III.   DISCUSSION

Stefano argues that the Department's changed interpretation of "firm release date" is invalid because it was not adopted in accordance with the rulemaking procedures of the APA.[11]   We agree.   Commonsense interpretations of existing

---

[11]   On appeal Stefano argues that the superior court erred by failing to grant his motion for reconsideration. However, most of Stefano's arguments relate to the merits of the underlying order granting summary judgment, rather than the motion to reconsider. *Cf. Miller v. McManus*, 558 P.2d 891, 892 (Alaska 1977) (noting appellate challenge to motion to reconsider raises only "the merits of reconsideration" rather than "the merits of the underlying order"). Stefano's argument is therefore better considered as a challenge to the summary judgment order. *See Wright v. Anding*, 390 P.3d 1162, 1169 (Alaska 2017) (" 'We apply a more lenient standard to pro se litigants' and

regulation generally need not be adopted through rulemaking. But when an agency alters its interpretation of existing regulation in a way that is inconsistent with the previous interpretation, rulemaking is required.[12]

The APA's definition of "regulation" is broad: It includes "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by [the agency]."[13] "The label an agency places on a policy or practice does not determine whether that rule falls under the APA."[14] Instead we consider substance.[15] When an agency makes a regulation, it must follow a formal rulemaking process, which requires notice and an opportunity for public involvement.[16] The reason for these notice and comment provisions is to prevent an agency from having "unfettered discretion to vary the requirements of its regulations at whim," which "invites the possibility that state actions

---

'consider pro se pleadings liberally in an effort to determine what legal claims have been raised.' " (first quoting *Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062-63 (Alaska 2005); and then quoting *Toliver v. Alaska State Comm'n for Hum. Rts.*, 279 P.3d 619, 622 (Alaska 2012))).

[12] We review a grant of summary judgment de novo, "affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law." *Beegan v. State, Dep't of Transp. & Pub. Facilities*, 195 P.3d 134, 138 (Alaska 2008). "Whether an agency action is a regulation is a question of law that does not involve agency expertise, which we review applying our independent judgment." *Chevron U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 35 (Alaska 2016) (quoting *State, Dep't of Nat. Res. v. Nondalton Tribal Council*, 268 P.3d 293, 299 (Alaska 2012)).

[13] AS 44.62.640(a)(3).

[14] *Jerrel v. State, Dep't of Nat. Res.*, 999 P.2d 138, 143 (Alaska 2000).

[15] *Id.*

[16] *See* AS 44.62.180-290 (describing process for adopting administrative regulations).

may be motivated by animosity, favoritism, or other improper influences."[17]  Yet "[w]e must balance these concerns with the practical realities of administrative governance."[18]  Requiring that every agency interpretation of governing law "be preceded by rulemaking would result in complete ossification of the regulatory state."[19]  "[A]gencies must have some freedom to apply relevant statutes without the burden of adopting a regulation each time they do so."[20]

To determine whether an agency action is a regulation that requires formal rulemaking, we use a two-part test.[21]  An agency adopts a regulation when it (1) implements, interprets, or makes specific a statutory directive and (2) that action impacts the agency's dealings with the public.[22]  Changing the definition of "firm release date" meets both parts of the test.

### A.    The Department's Policy Change Was A Regulation Because It Altered The Agency's Previous Interpretation.

Not all agency interpretations of statute or existing regulation require rulemaking.  Generally speaking, a "commonsense interpretation of existing requirements" need not be adopted through the formal rulemaking process.[23]  But if the interpretation adds requirements of substance, is "expansive or unforeseeable," or "alters [the agency's] previous interpretation," rulemaking is required.[24]

---

[17]     *Jerrel*, 999 P.2d at 144.

[18]     *AVCG, LLC v. State, Dep't of Nat. Res.*, 527 P.3d 272, 280 (Alaska 2023).

[19]     *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1086 (Alaska 2011).

[20]     *Chevron U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 36 (Alaska 2016).

[21]     *AVCG*, 527 P.3d at 280.

[22]     *Chevron*, 387 P.3d at 36.

[23]     *Id.*

[24]     *Id.* at 37.

The need for rulemaking when the agency changes its interpretation flows from the text of the APA itself. The APA's definition of a regulation includes not only rules and standards of general application but also "the amendment, supplement, or revision" of such rules and standards.[25] The need for rulemaking when an interpretation changes also rests on the APA's statutory purpose of providing adequate notice to regulated parties.[26] The notice requirement allows "members of the public sufficient information to decide whether their interests could be affected by the agency action and thus whether to make their views known to the agency."[27] Notice also gives potentially regulated parties a chance to conform their actions to the agency's expectations.[28]

The Department changed its definition of "firm release date" twice. Before 2016 the Department did not count the date on which a prisoner was to be released on discretionary parole as a "firm release date." In 2016 it took the position that a prisoner's "firm release date" included the date on which the prisoner is to be released on discretionary parole. In 2019 the Department reversed course and decided that the date of release on discretionary parole did not count as a "firm release date." There is no question that the Department changed its interpretation of "firm release date" as a change in official policy, so formal rulemaking was required.[29]

---

[25] AS 44.62.640(a)(3).

[26] *See* AS 44.62.180-290 (describing process for adopting administrative regulations, including notice of proposed action and opportunity for public comment).

[27] *State v. First Nat'l Bank of Anchorage*, 660 P.2d 406, 425 (Alaska 1982).

[28] *See AVCG, LLC v. State, Dep't of Nat. Res.*, 527 P.3d 272, 286 (Alaska 2023) ("Applying standards that already exist does not require formal rulemaking because . . . [p]ast decisions provide regulated entities with notice of the agency's expectations . . . .").

[29] *Chevron*, 387 P.3d at 37 (stating agency action that "alters [the agency's] previous interpretation" requires formal rulemaking). *But cf. id.* at 40 (holding that deliberative internal documents showing agency previously considered different

The Department's arguments to the contrary are unpersuasive. The Department argues that its interpretation of "firm release date" is just "a commonsense interpretation of the regulation's applicability" and therefore not a regulation itself. But the Department does not acknowledge that its interpretation of the regulation has changed, and the cases it relies on involved commonsense interpretations of statute or regulation that were *not* changes from prior interpretations.[30] The first time an agency adopts a commonsense interpretation of a statute, rulemaking may not be required. But when an agency "alters its previous interpretation" in a way that is inconsistent, then rulemaking is required.[31] Because that is what the Department did here, its action met the first criterion for rulemaking.

## B. The Department's Multiple Changes To The Definition Affected The Public.

The second criterion for rulemaking is that the agency's action "affects the public" — or more precisely, its action "alter[s] the rights or interests" of members

---

interpretation did not establish need for rulemaking because earlier interpretation was "never meant to represent . . . official policy"); *North Slope Borough v. State*, 484 P.3d 106, 118 (Alaska 2021) (holding that agency did not violate APA when it applied statutory provision it had mistakenly failed to apply in previous years because "there [wa]s no indication in the record that . . . failure to apply the controlling law constituted a formal interpretation of the statute that would bind future review").

[30] Specifically, the State cited *Alaska Ctr. for the Env't v. State*, 80 P.3d 231 (Alaska 2003) (holding that agency's interpretation of "major energy facility" to not include an airport expansion project that only used fuel incidentally was common sense) and *Alyeska Pipeline Serv. Co. v. State, Dep't of Env't Conservation*, 145 P.3d 561, 573 (Alaska 2006) (holding that agency's interpretation of "costs," in context of program designed to make industry shoulder financial burden of permitting process, to include fees incurred in defending permit was commonsense interpretation that did not require rulemaking).

[31] *Chevron*, 387 P.3d at 37.

of the public.[32]  But an agency's action does not affect the public if it merely "alter[s] the manner in which the parties present themselves or their viewpoints to the agency."[33]

*Department of Natural Resources v. Nondalton Tribal Council* illustrates this distinction.[34]  In that case the Department of Natural Resources created a land use plan for Bristol Bay that split the region into subdivisions and identified the administration's goals for each subdivision.[35]  Interested parties challenged this plan, arguing that it was a regulation because the planned uses for each subdivision would alter the rights and interests of stakeholders.[36]  We disagreed.  The land use plan was simply a framework for future policymaking that would later be implemented "through downstream agency action."[37]  We acknowledged that those later agency actions would likely affect the parties' rights and interests.[38]  But the land use plan itself "[did] not alter the rights of the parties, [did] not deprive any party of a fair opportunity for public participation, embodie[d] no finding as to a particular application and [did] not establish criteria by which particular applications should be evaluated."[39]  Therefore it was not a regulation.

---

[32]  *State, Dep't of Nat. Res. v. Nondalton Tribal Council*, 268 P.3d 293, 304 (Alaska 2012).

[33]  *Id.* at 303 (quoting *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980)).

[34]  *Id.*

[35]  *Id.* at 296-97.

[36]  *Id.* at 304-05.

[37]  *Id.* at 305.

[38]  *Id.*

[39]  *Id.* at 303 (quoting *Kachemak Bay Watch, Inc. v. Noah*, 935 P.2d 816, 825 (Alaska 1997)); *accord Kachemak Bay Watch*, 935 P.2d at 825-26 (holding that agency's act of creating districts for future management did not affect public because creation of districts did not affect any parties' interests or rights — it just provided an

By contrast, the definition of "firm release date" affects prisoners' interests because it determines when they will be eligible for release on furlough. It "establish[es] criteria" by which applications for furlough will be evaluated.[40] It also "embodies [a] finding as to a particular application"[41] because a prisoner with a sentence of more than one year only qualifies for discretionary furlough within three years of the prisoner's firm release date.[42] Under the new definition, Stefano and other similarly situated prisoners no longer qualify for discretionary furlough. Their interests have been affected in a direct and tangible way.[43]

The Department counters that the new definition is not a regulation because it "relates only to the internal management of a state agency."[44] But the Department does not acknowledge the narrowness of the "internal management of a

---

administrative framework for later regulations to be applied in); *cf. Kenai Peninsula Fisherman's Co-op. Ass'n v. State*, 628 P.2d 897, 905-06 (Alaska 1981) (holding that agency's management plan that specified how certain salmon runs should be managed affected public because management plan was cited as justification for closing fishing area).

[40]    *Nondalton Tribal Council*, 268 P.3d at 303.

[41]    *Id.*

[42]    22 AAC 05.321(c) ("To be eligible for consideration for a prerelease furlough, the prisoner . . . must . . . be within three years or less of the firm release date.").

[43]    Inmates do not have a right to be furloughed. *Hertz v. Macomber*, 297 P.3d 150, 157-58 (Alaska 2013). But because the legislature has created a furlough program, inmates have a due process right to "fair and impartial consideration" of their furlough applications and to not have "furlough release conditions [imposed] for an improper purpose." *Id.* at 158. The Department's policy change affects inmates' interests by eliminating their opportunity to seek furlough and have their applications considered.

[44]    AS 44.62.640(a)(3) (defining "regulations" for purposes of APA and creating exception for policies that "relate[] only to the internal management of a state agency").

state agency" exemption. "[T]he exemption's critical feature is that it covers *agency actions that do not themselves alter the rights or interests of parties*."[45] For example, an agency's hours of operation is the prototypical internal policy. It may affect a person's ability to interact with the agency, but effect on the person's actual rights and interests is indirect and incidental.[46] In contrast, the definition change here directly renders some inmates ineligible for furlough when they previously would have been eligible. The change therefore "alters the rights or interests of parties."[47]

The Department also defends the superior court's mistaken understanding of a discretionary parole release date. The superior court stated that "even if an inmate meets the eligibility criteria defined in AS 33.16.100(a) by a certain date, his or her release is still discretionary," and "discretionary parole is just that — discretionary. [The Department]'s decision to exclude an inmate's projected release date based on the date he or she becomes *eligible* for discretionary parole from its interpretation of '*firm* release date' reflects a common sense interpretation of [the regulation]." Although the superior court was correct that a prisoner who meets the eligibility criteria for discretionary parole is not entitled to receive discretionary parole, that is beside the point. Once the Board votes to grant discretionary parole, this grant may only be rescinded or modified by another meeting of and vote by the Board.[48] Inmates who have been granted a discretionary parole release date are not merely "eligible" for parole — they have been granted parole and will be released on a specific date, unless the Board takes further action. Stefano's discretionary parole release date is substantially "firmer" than the superior court suggested. By deciding that a discretionary parole

---

[45] *Nondalton Tribal Council*, 268 P.3d at 303 (emphasis in original) (quoting *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980)).

[46] *Id.*

[47] *Id.*

[48] AS 33.16.100(b).

release date was not a "firm release date," the Department directly changed Stefano's status from an inmate eligible for furlough to an inmate ineligible for furlough. This change directly affected his interests (and those of inmates in the same position).

Finally, the Department appears to assert that prisoners are not considered members of the public for purposes of the APA. Yet the Department does not cite — and we cannot find — any support in the text of the APA for this proposition. We have also previously treated prisoners as members of the public for APA purposes.[49] The Department also seems to rely on the statutory definition of prisoner: "a person held under the authority of state law in official detention as defined in AS 11.81.900(b)."[50] But the statutory text does not on its face suggest that prisoners are not members of the public for APA purposes, and the Department does not explain why it should be interpreted that way. We therefore reject the argument.

Because the Department's policy change met both prongs of our test for identifying a regulation, the Department was required to adopt it through rulemaking. It was therefore error to grant summary judgment to the Department against Stefano's APA claim.

## IV. CONCLUSION

We REVERSE the superior court's grant of summary judgment and remand for further proceedings.

---

[49] *See Hertz v. Macomber*, 297 P.3d 150, 155 (Alaska 2013) (applying APA's requirements to challenge of furlough regulations by prisoner).

[50] AS 33.30.901(12).