*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MAPLE SPRINGS MANAGEMENT, LLC, | ) ) ) | Supreme Court No. S-19120 |
| Appellant, | ) ) | Superior Court No. 3AN-23-06026 CI |
| v. | ) ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT OF HEALTH, HEIDI HEDBERG, COMMISSIONER, in an official capacity, and ASPEN CREEK MANAGEMENT, LLC, | ) ) ) ) ) ) ) | No. 7804 – February 27, 2026 |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Laura Hartz, Judge.

Appearances: Jennifer M. Coughlin, Landye Bennett Blumstein, LLP, Anchorage, for Appellant. Robert Kutchin, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee State of Alaska, and Mara E. Michaletz and Jennifer C. Alexander, Birch Horton Bittner & Cherot, Anchorage, for Appellee Aspen Creek Management, LLC.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate and Oravec, Justices.

CARNEY, Chief Justice.

# I.    INTRODUCTION

A nursing home company applied for a certificate of need to build a new skilled nursing facility in Anchorage. According to the Department of Health's regulations, the company was required to use a specific equation to support its claim for a baseline need for nursing beds. Its calculations using that equation did not show the minimum need required by the Department. But when the Department reviewed the application, it nevertheless recommended that the commissioner issue the certificate of need because other indicators cited by the applicant demonstrated a need for the facility.

The Department's decision was challenged by a competing company that had previously been granted its own certificate of need to build a similar facility. The competitor argued that the Department violated its regulations by issuing the certificate of need when the applicant failed to show a need for the Department's minimum number of beds under the prescribed equation. It also argued the Department violated the Administrative Procedure Act (APA) by adopting a new regulatory interpretation without first undertaking rulemaking. The Department responded that it approved the application under a different regulatory provision which allowed it to waive the requirement that an applicant show a need for the minimum number of beds. And it argued that its interpretation of the regulations was consistent with its prior actions.

The superior court affirmed the Department's interpretation of its regulations and its decision to grant the certificate of need. The competing company appealed. We affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. Background

The Department administers the certificate of need program.[1]  Under the program, a healthcare facility cannot be constructed without first obtaining a certificate of need from the Department.[2]  The purpose of the program is to "promote the balanced development and operation of such facilities throughout the state" to "ensure that no area receives more or fewer services than it needs."[3]

Certificate applications are evaluated in an extensive review process guided by statute and established by regulation.[4]  The statute requires the Department to consider seven distinct factors, including community, regional, and statewide need.[5]  The regulations require an applicant to satisfy a series of review standards, both general and specific to the type of healthcare facility proposed.[6]  In this case, the regulations that govern the construction of skilled nursing facilities are at issue.

---

[1]  AS 18.07.021 ("The department shall administer the certificate of need program under this chapter and perform other functions prescribed in this chapter."); *see also* AS 18.07.031(a)(1) (providing "a person may not make an expenditure of $1,000,000 or more . . . unless authorized under the terms of a certificate of need issued by the department . . . [to] construct[] . . . a health care facility . . . .").

[2]  AS 18.07.031.

[3]  *Alaska Spine Ctr., LLC v. Mat-Su Valley Med. Ctr., LLC*, 440 P.3d 176, 178 (Alaska 2019).

[4]  AS 18.07.101 (directing commissioner of the Department to adopt "regulations that establish procedures under which sponsors may make application for certificates of need required by this chapter and that govern the review of those applications by the department"); 7 Alaska Administrative Code (AAC) 07.001 (establishing requirement that healthcare facilities seeking to provide services in Alaska must apply for certificate of need to construct and operate facility).

[5]  AS 18.07.043(b).

[6]  7 AAC 07.025; *see also Alaska Spine Ctr., LLC*, 440 P.3d at 178.

A skilled nursing facility is "a type of nursing home that . . . meet[s] long term health care needs for individuals who have the potential to function independently, but that require rehabilitative care as well as other nursing care and do not need hospitalization to receive this care." One of the review standards for construction of a new facility provides that "[a] new freestanding long-term nursing facility will not be approved unless the applicant has demonstrated a need for a minimum of 40 beds." Thus, in order to obtain a certificate of need for a new skilled nursing facility, an applicant must demonstrate that there is a need for at least 40 beds.

To determine whether there is a need for 40 new beds, the Department uses the composite age specific use (CASU) method to project future need for long-term nursing home beds. The CASU formula consists of three steps: Step one calculates the average daily nursing home bed-use rate "five years from implementation of the project" in four separate age groups. This is calculated by determining the average nursing home bed-use rate in each age group for the preceding three years. The averages for each age group are then multiplied by the projected population for that age group; those multiplied values are then added together to determine the "caseload."

At step two, the caseload calculated in step one is divided by the "nursing home target occupancy," which the methodology sets at 90%. This produces the projected nursing home bed need. Finally, step three requires multiplying the projected nursing home bed need by the "service area share," defined as "the proposed service area's current share of the population to be served."

Department staff review an application "to determine if . . . [it] meets the certificate of need review standards and uses" the methodologies established in a 2005 Department document adopted by reference into the regulation.[7] Staff then send their

---

[7] 7 AAC 07.025(a)(3) adopts the Department's document, *Alaska Certificate of Need Review Standards and Methodologies*. State, Dep't of Health &

analysis to the Department commissioner[8] with a recommendation to either grant or deny the application.[9] The regulations allow an applicant to request waiver of a review standard, like the 40-bed need standard, if "meeting the standard would cause a reduction in the availability, quality, or accessibility of services."[10] The same regulations prohibit the Department from waiving a methodology such as the CASU equation used to calculate skilled nursing facility bed need.[11]

### B.    Facts

Maple Springs Management was issued a certificate of need to construct a 120-bed skilled nursing facility in Anchorage in May 2021. In January 2022 Aspen Creek Management also applied for a certificate of need to construct a new 150-bed skilled nursing facility in the Anchorage area. To satisfy the 40-bed need review standard, Aspen Creek cited both quantitative and qualitative data.

When Aspen Creek calculated need using the CASU methodology, it yielded a deficit of 22 beds in the Anchorage area rather than 40.[12] In its application,

---

Soc. Servs., Alaska Certificate of Need Review Standards and Methodologies (Dec. 9, 2005), https://health.alaska.gov/media/1fqdn1lo/certificate-of-need-review-standards-and-methodologies.pdf. The document provides that the department will use, among others, the CASU methodology.

[8]    7 AAC 07.060(a).

[9]    7 AAC 07.025(a); *see* 7 AAC 07.070.

[10]    7 AAC 07.025(b)(1) ("An applicant may request that a review standard adopted by reference . . . be waived. The department will recommend to the commissioner that a review standard be waived if the applicant documents to the department's satisfaction that . . . meeting the standard would cause a reduction in the availability, quality, or accessibility of services to the consumer in the service area . . . .").

[11]    7 AAC 07.025(c) ("The department will not waive a methodology adopted by reference . . . .").

[12]    Aspen Creek excluded data from 2020 that it argued was skewed due to the COVID-19 pandemic.

Aspen Creek criticized the CASU methodology for looking only at "past utilizations to project current and future need" rather than considering "past or present skilled nursing bed deficits or unmet demand." Aspen Creek instead referred to a study it had commissioned using methodologies used in other states to calculate need. That study showed a bed deficit far in excess of 40, which Aspen Creek argued was a more accurate representation of the bed need in Anchorage.

Qualitatively, Aspen Creek acknowledged that there were three existing skilled nursing facilities in the Anchorage area, as well as the one that Maple Springs planned to open. But Aspen Creek noted that the existing facilities were already operating at capacity. It observed that Anchorage played a unique role as a "healthcare hub" for many rural communities and asserted that role meant that more beds were needed. It also emphasized that its proposed facility would fill an unmet need statewide by providing sub-acute care beds, which serve patients who do not require long-term care but still need interventions like ventilators or tracheostomies for a short period. Such care was currently unavailable in Alaska.

Maple Springs opposed Aspen Creek's application during a public comment period. It pointed out that Aspen Creek failed to satisfy the 40-bed need review standard using the CASU methodology as the regulations required. Department staff acknowledged that the CASU methodology did "not show a need for more than 40 beds."[13] But it nevertheless concluded that despite not satisfying the 40-bed need standard under the CASU methodology, Aspen Creek made "a compelling argument" that its proposed facility would fill an existing need.

Department staff cited three justifications in their recommendation to the commissioner to approve Aspen Creek's certificate application: (1) the new facility would be located in midtown Anchorage, while the existing Anchorage skilled nursing

---

[13] The Department also noted that Aspen Creek "did not apply the methodology accurately" because it excluded the 2020 data.

facilities were located "across town" and Maple Springs's facility was in South Anchorage; (2) an additional facility would increase healthcare accessibility in Anchorage because of its status as a healthcare hub for surrounding rural communities; and (3) the facility would provide sub-acute care not offered anywhere else in the state.

The commissioner agreed with the staff recommendation and granted Aspen Creek a certificate of need to build a skilled nursing facility. The decision was contained in a letter outlining the estimated project costs, construction dates, and project specifications.

## C. Proceedings

Maple Springs sued, seeking injunctive and declaratory relief.[14] It argued that the Department violated the certificate of need program regulations by issuing Aspen Creek a certificate when its application failed to show a need for 40 beds under the CASU methodology. It argued that the Department essentially waived the CASU methodology when it issued Aspen Creek a certificate in violation of the regulation that expressly prohibits waiving a methodology.[15]

Aspen Creek moved to dismiss Maple Springs's complaint under Alaska Civil Rule 12(b)(6). It argued that the Department did not waive the CASU methodology when it issued the certificate. It asserted that the Department exercised

---

[14] There is no administrative appeal of the Department's decision in this case because Maple Springs met the statutory requirements to request injunctive relief from the court. *See* AS 18.07.091(a):

> Injunctive relief against violations of [the certificate of need] chapter or regulations adopted under this chapter may be obtained from a court of competent jurisdiction at the instance of the commissioner, a holder of a certificate of need who is adversely affected in the exercise of the activities conducted in violation of the certificate, or any member of the public substantially and adversely affected by the violation.

[15] 7 AAC 07.025(c).

its discretion to waive a review standard — in this case, the 40-bed need standard — when "meeting the standard would cause a reduction in the availability, quality, or accessibility of services to the consumer in the service area."[16] Aspen Creek characterized Maple Springs's argument as inaccurately conflating review standards with the methodologies used to measure them.  The Department joined Aspen Creek's motion to dismiss.

Maple Springs opposed Aspen Creek's motion and filed a cross motion for summary judgment.[17]  It first argued that the regulation's prohibition on waiving a methodology was deemed "enforceable" in *Kahtnu Ventures, LLC v. Department of Health & Social Services* — a 2014 superior court case involving an appeal of the Department's decision to grant a certificate of need to build a surgery center.[18]  It also argued that the Department's authority to waive a review standard was of "no relevance to this case" because that authority only applied to applications seeking to build facilities with less than 40 beds.[19]

Maple Springs also argued that the legislative findings associated with the certificate of need program's authorizing statutes supported a more restrictive interpretation of the regulations and underscored the legislature's intent that a certificate not be issued without a "demonstrated long-term need for [the] beds on a regional basis."  And it argued that if the Department seeks flexibility to measure need using an alternative methodology, it must go through formal rulemaking to update its regulations.

---

[16]    *See* 7 AAC 07.025(b)(1).

[17]    *See* Alaska R. Civ. P. 56.

[18]    *See Kahtnu Ventures, LLC v. Dep't of Health & Soc. Servs.* ("*Kahtnu Ventures*"), OAH No. 12-0123-DHS (Alaska Super., June 18, 2014), https://aws.state.ak.us/OAH/Decision/Display?rec=1965.

[19]    Maple Springs did not include a citation to authority in support of this argument.

Aspen Creek responded that Maple Springs's interpretation was more restrictive than the certificate program's authorizing statutes required and would compel the Department to reject an application outright if it failed to satisfy the 40-bed minimum despite the Department's discretion to waive a review standard. It pointed to a different superior court appeal, *South Anchorage Ambulatory Surgery Center v. State of Alaska, Department of Health & Social Services*,[20] where the court declined to interpret the regulations as requiring "a more stringent test for the issuance of a [certificate of need] than the statutes intended." It distinguished its case from *Kahtnu Ventures* by explaining that, unlike the Department's decision on Aspen Creek's application, the Department in *Kahtnu Ventures* had declined to exercise its authority to waive a review standard.

The superior court held oral argument. Soon thereafter, our decision in *Stefano v. State of Alaska, Department of Corrections* was published.[21] The parties agreed *Stefano*'s holding was relevant to this case, but for different reasons. Maple Springs argued that under *Stefano*, before the Department issued Aspen Creek a certificate — an action it claimed was inconsistent with the Department's previous interpretation of the regulations — the Department needed to go through formal rulemaking under the APA to alter that interpretation. Aspen Creek agreed *Stefano* was relevant but argued instead that the Department's decision was a commonsense interpretation of the regulations that did not require formal rulemaking. The court ordered supplemental briefing on the issue.

After considering the supplemental briefs and arguments, the superior court denied Maple Springs's motion for summary judgment and granted Aspen

---

[20] *See South Anchorage Ambulatory Surgery Ctr. v. State, Dep't of Health & Soc. Servs.* ("*South Anchorage*"), OAH No. 06-0152-DHS (Alaska Super., July 2, 2008), https://aws.state.ak.us/OAH/Decision/Display?rec=1960.

[21] 539 P.3d 497 (Alaska 2023).

Creek's motion to dismiss. It found that the Department's interpretation of the regulations reconciled the seemingly conflicting regulatory provisions that allowed the Department to waive a review standard but prohibited it from waiving a methodology. To harmonize the conflicting provisions, the court explained that "[w]hen read together both things can be true: (1) the methodology must be used; and (2) the Department has the authority to waive a review standard and approve a project," including when "the 40-bed minimum, or another review standard has not been met."[22]

The court concluded that the Department's decision to issue Aspen Creek a certificate of need conformed with the regulations. It explained that the Department acknowledged Aspen Creek used the CASU methodology in its application, though the result did not produce a 40-bed deficit. But it noted the countervailing reasons the Department identified in favor of approval: (1) the facility's proposed location, and (2) its plan to offer sub-acute care. The court explained that those observations coupled with Anchorage's status as a "healthcare hub" for surrounding rural communities demonstrated the Department acted reasonably by "permissibly waiv[ing] the standard" because "meeting the standard would cause a reduction in the availability, quality or accessibility of services to the consumer in the service area."[23]

---

[22] It also found Maple Springs's interpretation inconsistent with the certificate program's authorizing statute, AS 18.07.043, which requires the Department to consider several factors when assessing a certificate application — only one of which is need. It found that "nothing in the legislative history . . . suggest[s] that need or the number of beds ha[s] primacy over the remaining factors."

[23] The court rejected Maple Springs's argument that the approval amounted to a change in the Department's previous interpretation of those regulations, as demonstrated by its decision to amend 7 AAC 07.025 after the *South Anchorage* decision. The court explained that those arguments were "based on a false premise: just because the Department can waive a review standard does not make waiver mandatory." It stated that the Department's later decision not to exercise that discretion to waive a review standard in *Kahtnu Ventures* did not render its authority nonexistent.

Maple Springs moved for reconsideration, which the superior court denied. It again explained that the Department did not rely on an "alternative methodology" when it issued Aspen Creek a certificate of need, but instead exercised its authority to waive a review standard to avoid a "reduction in the availability, quality or accessibility of services."

Maple Springs appeals.

## III. STANDARD OF REVIEW

We review the superior court's decision to grant a motion to dismiss de novo.[24] "When the superior court acts as an intermediate appellate court, we independently review the merits of the underlying administrative decision."[25] "We review an agency's interpretation and application of its own regulations using the reasonable basis standard of review and will defer to the agency's interpretation unless its interpretation is plainly erroneous and inconsistent with the regulation."[26] "When applying the reasonable basis test, we 'seek to determine whether the agency's decision is supported by the facts and has a reasonable basis in law, even if we may not agree with the agency's ultimate determination.' "[27]

When reviewing an agency's interpretation of a regulation involves issues of statutory interpretation, we use our independent judgment.[28] We also apply our

---

[24] *Alleva v. Mun. of Anchorage*, 467 P.3d 1083, 1087 (Alaska 2020) (citing *Pedersen v. Blythe*, 292 P.3d 182, 184 (Alaska 2012)).

[25] *Heller v. State, Dep't of Rev.*, 314 P.3d 69, 72 (Alaska 2013).

[26] *North Slope Borough v. State*, 484 P.3d 106, 113 (Alaska 2021) (quoting *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014)) (internal quotation marks omitted).

[27] *Davis Wright Tremaine LLP*, 324 P.3d at 299 (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

[28] *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 991 (Alaska 2019).

"independent judgment to determine whether an agency action is subject to the notice and comment provisions of the [Administrative Procedure Act]."[29] When applying our independent judgment, we adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[30]

## IV. DISCUSSION

Whether the Department had a reasonable basis to issue Aspen Creek a certificate of need depends on whether it acted in accordance with the certificate program regulations. Maple Springs argues the Department failed to follow its regulations when it approved Aspen Creek's application. Its argument is based on its interpretation of the regulations, which it argues is supported by the certificate program's authorizing statutes and principles of statutory interpretation, even though it differs from the Department's interpretation. Maple Springs also contends that the interpretation of the regulations the Department relied on to issue Aspen Creek a certificate is a departure from its previous interpretation. And in light of our previous cases, it argues the Department was required to undertake rulemaking procedures to alter its interpretation in accordance with the APA.

We disagree with Maple Springs and affirm the superior court's decision that the Department's interpretation of the regulations is more consistent with the regulations' plain language and authorizing statutes than Maple Springs's. We also conclude that the Department's interpretation is a commonsense one and not one that requires formal rulemaking. Lastly, we conclude that the Department's decision was both consistent with the regulations and supported by a reasonable basis.

---

[29] *North Slope Borough*, 484 P.3d at 113 (quoting *Alyeska Pipeline Serv. Co. v. State*, 288 P.3d 736, 741-42 (Alaska 2012)) (internal quotation marks omitted).

[30] *State, Dep't of Rev. v. Nabors Int'l Fin., Inc.*, 514 P.3d 893, 898 (Alaska 2022) (quoting *Premera Blue Cross v. State, Dep't of Com., Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1115 (Alaska 2007)).

**A.    The Department's Decision Is Consistent With The Regulations' Plain Meaning.**

We review whether an agency's interpretation of its own regulations is "plainly erroneous and inconsistent with the regulation."[31]  Our analysis begins with the regulations' text.

The regulations at issue fall under 7 AAC 07.025, which has three separate provisions with three distinct functions.  Subsection (a) instructs the Department to "review the [certificate of need] application and supporting documents to determine if [it] . . . meets the certificate of need review standards and *uses* the methodologies identified in the department's" 2005 document.[32]  Subsection (c) then provides that "[t]he department will not *waive* a methodology."[33]

Separately, subsection (b) provides that "[t]he Department will recommend to the commissioner that a review standard be waived if the applicant documents to the department's satisfaction that . . . meeting the standard would cause a reduction in the availability, quality, or accessibility of services to the consumer in the service area."[34]  Subsections (a) and (c) together require the Department to ensure an application "use[s]" the methodologies and prohibits the Department from "waiv[ing]" it.  Subsection (b) empowers the Department to waive a review standard when it determines that strict enforcement of that standard's requirements would result in the application being rejected, thereby reducing the availability, quality, or accessibility of healthcare services.

---

[31]    *Kuzmin v. State, Com. Fisheries Entry Comm'n*, 223 P.3d 86, 89 (Alaska 2009) (quoting *Copeland v. State, Com. Fisheries Entry Comm'n*, 167 P.3d 682, 683 (Alaska 2007)) (internal quotation marks omitted).

[32]    7 AAC 07.025(a)(3) (emphasis added).

[33]    7 AAC 07.025(c) (emphasis added).

[34]    7 AAC 07.025(b)(1).

Maple Springs interprets subsections (a) and (c) to require applicants to establish need by using only the CASU methodology. And because the Department cannot waive a methodology, Maple Springs contends the Department cannot issue a certificate of need if the CASU methodology fails to show a 40-bed deficit. It also argues that the Department may only exercise its discretion to waive a review standard under subsection (b) when the applicant seeks to build a facility with fewer than 40 beds, which does not apply to Aspen Creek's application for a 150-bed facility.

The Department counters that it followed the instructions in subsections (a) and (c). Its analysis acknowledged Aspen Creek "used" the methodology by calculating need in its application using the CASU equation. The Department argues it did not waive the CASU methodology because " 'to 'waive' means to 'relinquish' or to put off from immediate consideration.' "[35] It says that its review of Aspen Creek's application demonstrates a thorough consideration of the CASU methodology, and while the calculations failed to show a 40-bed deficit, that result nevertheless informed its recommendation. And the Department argues that Maple Springs's interpretation of subsections (a) and (c) ignores its authority under subsection (b), which it asserts it validly relied on when it granted the certificate of need.

Each party argues that its respective interpretation of the regulations is correct. "When interpreting . . . regulations, seemingly conflicting provisions must be harmonized."[36] The Department's interpretation, which utilizes the methodologies as a measurement indicator to determine whether a review standard has been met, harmonizes all three subsections of 7 AAC 07.025. As the superior court explained:

> In order to harmonize the subsections in 7 AAC 07.025(b) and (c), and give effect to each provision, the [c]ourt concludes that while under (c) the methodology must be

---

[35]     It cited the Merriam-Webster definition of *waive*.

[36]     *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014).

-14-                                                                    **7804**

used to calculate bed need (i.e. you can't substitute a different calculation for CASU) that the Department maintains the authority to waive the standard as provided in (b) and grant an application even where the 40-bed minimum, or another review standard has not been met. This is how the Department interprets the regulation, it is based on the plain text of its regulation, and the [c]ourt finds its interpretation reasonable.

We agree with the superior court. The need for 40 beds is a waivable review standard under subsection (b). The Department has the discretion to waive the review standards "if the applicant documents to the department's satisfaction that . . . meeting the standard would cause a reduction in the availability, quality, or accessibility of services . . . in the service area."[37] This is precisely what happened here.

Maple Springs argues that the Department may only exercise its discretion under subsection (b) when an applicant seeks to build a facility with less than 40 beds. But it has provided no authority to support its position. We see no such restriction. The regulations do not so limit the Department's authority.[38]

The Department is required to "use" the CASU methodology.[39] The plain meaning of the word *use* would simply require an applicant to utilize, employ, or apply the equation when it makes an application.[40] But Maple Springs's interpretation of subsections (a) and (c) together assigns a new meaning to the word *use*. Maple Springs would elevate the methodology from a measurement indicator to a threshold requirement that would compel the Department to reject a certificate application if the

---

[37]    7 AAC 07.025(b)(1).

[38]    *See* 7 AAC 07.025.

[39]    7 AAC 07.025(a)(3).

[40]    Black's Law Dictionary defines *use* as "the application or employment of something," while Merriam Webster Dictionary defines it as "to put into action or service." *Use*, BLACK'S LAW DICTIONARY (12th ed. 2024); *Use*, MERRIAM-WEBSTER.COM DICTIONARY (last visited Dec. 15, 2025).

CASU methodology did not show a 40-bed deficit. This interpretation is inconsistent with the regulations' plain language and would render the Department's discretion under subsection (b) meaningless. The Department's interpretation, on the other hand, gives meaning to each of 7 AAC 07.025's three subsections and is both reasonable and consistent with the regulations' text.

**B.    The Department's Interpretation Of The Regulations Is Consistent With The Program's Authorizing Statutes.**

When evaluating an agency's interpretation of a regulation, we consider whether that interpretation is "inconsistent with or contrary to the statute on which the regulation is based."[41] And we have previously recognized that "[a]n agency's interpretation is consistent with [a] statute unless the statute's text and purpose prohibit such an interpretation."[42]

When we interpret statutes, we do so "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[43] "We apply a sliding scale approach to statutory interpretation, and '[t]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be' to overcome that plain meaning."[44]

We conclude that the Department's interpretation is consistent with the certificate of need program's authorizing statutes. Maple Springs argues that the legislature's purpose in establishing the certificate of need program supports requiring

---

[41]    *Davis Wright Tremaine LLP*, 324 P.3d at 302.

[42]    *Id*.

[43]    *Basey v. Dep't of Pub. Safety, Div. of Alaska State Troopers, Bureau of Investigations*, 462 P.3d 529, 535 (Alaska 2020) (quoting *Michael W. v. Brown*, 633 P.3d 1105, 1109 (Alaska 2018)) (internal quotation marks omitted).

[44]    *Id*. (alteration in original) (quoting *State v. Dep't of Com., Cmty. & Econ. Dev., Div. of Ins. v. Alyeska Pipeline Serv. Co.*, 262 P.3d 593, 597 (Alaska 2011)).

all applicants to demonstrate need under one standard formula to ensure "consistency and predictability of outcomes." It relies on legislative findings accompanying the program. The Department and Aspen Creek point to the statutes themselves to show that the legislature intended to give the Department flexibility when evaluating an application. The statute provides that flexibility, they argue, by requiring the Department to consider several factors when promulgating regulations for the certificate of need program, not just need.

We first turn to the text of the program's authorizing statutes in Alaska Statute Title 18, chapter 7.[45] Two provisions apply to skilled nursing facilities: AS 18.07.043, which establishes the standard of review for skilled nursing facility applications; and AS 18.07.101, which directs the commissioner to adopt regulations that establish review procedures for certificate of need applications. Under AS 18.07.043, the Department must develop review standards that consider seven factors: planning process, existing bed use rates, need, efficiency and economies of scale, impact on the quality of care, financial feasibility and long-term viability, and cost-effectiveness.[46]

Neither AS 18.07.043's nor AS 18.07.101's text supports Maple Springs's argument that the Department must reject an application if the applicant fails to show a 40-bed need under the CASU methodology. They require only that the Department consider AS 18.07.043(b)'s factors when developing review standards and regulations.[47] Nothing in the text of either statute supports Maple Springs's interpretation that a certificate of need application cannot survive a poor CASU methodology outcome, even if all the other factors lean toward approving the

---

[45]    *See* AS 18.07.021–.111.

[46]    *See* AS 18.07.043(b).

[47]    *Id.*; *see also* AS 18.07.101.

application; nor does its interpretation comport with "reason, practicality, and common sense."[48]

The legislative history also does not support Maple Springs. The legislature amended the certificate of need program by adding AS 18.07.043 in 1999.[49] At that time, the standard of review for all certificate applications provided that an application would be granted "if the availability and quality of existing health care resources or the accessibility to those resources is less than the current or projected requirement for health services required to maintain the good health of citizens of this state."[50] The 1999 amendment expanded the standard of review from one based on availability, quality, and accessibility to a consideration of AS 18.07.043(b)'s seven factors.[51]

We have previously recognized that by creating the certificate of need program, the legislature sought "to promote the balanced development and operation of such facilities throughout the state," and "to ensure that no area receives more or fewer services than it needs."[52] The findings accompanying the bill that established the certificate of need program demonstrate its intent.[53] The findings show that the legislature wanted "demonstrated long-term need" to be considered, in addition to

---

[48]    *Basey*, 462 P.3d at 535.

[49]    Ch. 55, § 5, SLA 1999; *see* House Bill (H.B.) 187, 21st Leg., 1st Sess. (1999).

[50]    Ch. 55, § 5, SLA 1999 (showing amendment to Ch. 275, § 2, SLA 1976). This version of AS 18.07.041 was updated to limit its applicability only to certificate applications proposing to construct facilities "other than nursing home beds or . . . for a heath care facility other than a nursing home." *See* AS 18.07.041.

[51]    Ch. 55, § 5, SLA 1999; *see* AS 18.07.043(b).

[52]    *Alaska Spine Ctr., LLC v. Mat-Su Valley Med. Ctr., LLC*, 440 P.3d 176, 178 (Alaska 2019).

[53]    Ch. 55, § 5, SLA 1999.

financial feasibility, public participation in the planning process, and consistency with the state's long-term healthcare planning.[54]

Maple Springs cites a single legislative finding — that the primary purpose of the program is "to ensure that a certificate of need for new nursing home beds is not approved without a . . . demonstrated long-term need for those beds on a regional basis"[55] — as evidence that the legislature prioritized "need" above all other factors. But need was one of many factors cited by the legislature in its findings and in the statute itself.[56] The legislature's decision to amend the original standard of review from a consideration of availability, quality, and accessibility to an evaluation based on AS 18.07.043(b)'s seven factors[57] also supports the Department's interpretation.

The Department's interpretation of the regulations is consistent with the statutes and legislative intent. Its decision to issue Aspen Creek a certificate of need is consistent with the program's purpose.

### C. The Department's Interpretation Did Not Require Formal Rulemaking.

Next, we consider whether the Department's decision is consistent with the APA. "When an agency makes a regulation, it must follow a formal rulemaking process which requires notice and an opportunity for public involvement."[58] That process is set forth in the APA,[59] which defines a "regulation" as "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of

---

[54]  *Id.*

[55]  *See id.*

[56]  *Id.*; *see also* AS 18.07.043(b).

[57]  Ch. 55, § 5, SLA 1999.

[58]  *Stefano v. State, Dep't of Corr.*, 539 P.3d 497, 502 (Alaska 2023).

[59]  *Id.*

a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered."[60]

Once an agency establishes regulations, "it is bound by [them] unless and until it repeals or amends the regulation[s] using the proper procedure."[61] But we have recognized that "[n]ot all agency interpretations of statute or existing regulation require rulemaking."[62] Generally, an agency is not required to undertake formal rulemaking under the APA when an action is consistent with a "commonsense interpretation of existing requirements."[63] An agency's interpretation may not be a commonsense one if it "adds requirements of substance, is expansive or unforeseeable, or alters the agency's previous interpretation."[64]

Maple Springs argues that the Department's decision relied on a new interpretation of the regulations without first complying with the APA's formal rulemaking procedures. It argues that the Department's previous interpretation is demonstrated by the *South Anchorage* and *Kahtnu Ventures* cases, which combined show the Department "had not intended to allow exceptions to use of the methodologies."

The Department and Aspen Creek respond that the decision to issue Aspen Creek a certificate of need did not rely on a new regulatory interpretation, but rather constituted a commonsense interpretation of the regulations and was not subject to formal rulemaking. They contend that *South Anchorage* and *Kahtnu Ventures* are two

---

[60]    AS 44.62.640(a)(3).

[61]    *Burke v. Houston NANA, LLC*, 222 P.3d 851, 868-69 (Alaska 2010) ("Administrative agencies are bound by their regulations just as the public is bound by them.").

[62]    *Stefano*, 539 P.3d at 502.

[63]    *Id*. (quoting *Chevron U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 39 (Alaska 2016)) (internal quotation marks omitted).

[64]    *Id*.

examples of the Department declining to exercise its discretion to waive a review standard; they also point to additional examples where the Department has since recommended approving a certificate of need when the standard methodology did not demonstrate need as defined by the review standards.

We conclude that the Department's interpretation of its regulations is a commonsense interpretation that was not subject to formal rulemaking procedures. First, its interpretation does not add requirements of substance to the existing regulations.[65] The regulations have always provided the Department with discretion to waive a review standard when "meeting the standard would cause a reduction in the availability, quality, or accessibility of service to the consumer in the service area."[66] The Department's interpretation does not rely on authority it did not already possess; it does not alter the procedures of the review process; and it does not create new substantive requirements for applicants. When submitting an application for a certificate of need, applicants must still satisfy the review standards and use the methodologies set forth in the Department's 2005 document.

Second, the Department's interpretation is neither expansive nor unforeseeable.[67] It is common sense that the Department would interpret the regulations in such a way as to reconcile subsections (b) and (c) and to give both a meaningful role in the application review process. And because the regulations have consistently allowed the Department to waive a review standard, it was foreseeable that the Department would utilize its authority and discretion to do so.[68]

---

[65]    *See id.*

[66]    7 AAC 07.025(b)(1).

[67]    *See Stefano*, 539 P.3d at 502.

[68]    *See Chevron U.S.A., Inc.*, 387 P.3d at 39 (concluding it was foreseeable agency "would use the tool the legislature gave it — its discretion[]").

Lastly, the Department's interpretation is consistent with its prior actions.[69]  The parties provide four prior examples in their briefs.[70]  We review each one in turn.  In *South Anchorage*, an applicant sought a certificate of need to construct a surgery center.[71]  The standard methodology for calculating need for surgery beds indicated an existing surplus of beds.[72]  The applicant argued that an alternative methodology was a better indicator of need.[73]

The commissioner denied the application, and the applicant appealed to an administrative law judge (ALJ).[74]  The ALJ found that the Department should have approved the application because the alternative analysis was a more accurate predictor of future need.[75]  The commissioner declined to change the decision, explaining that the "department did not intend to allow exceptions to the methodologies, but only the standards."[76]

The applicant then appealed to the superior court, which concluded that restricting applicants to one methodology was inconsistent with the certificate of need program's authorizing statutes because that methodology failed "to predict health care needs."[77]  All parties agree that following the court's decision in *South Anchorage*,

---

[69]  *See Stefano*, 539 P.3d at 502.

[70]  *See Chevron U.S.A., Inc.*, 387 P.3d at 40-41 (evaluating documents intended to represent agency's "official policy positions").

[71]  *South Anchorage*, OAH No. 06-0152-DHS at 1 (Alaska Super., July 2, 2008), https://aws.state.ak.us/OAH/Decision/Display?rec=1960.

[72]  *Id.* at 2.

[73]  *See id.*

[74]  *Id.*

[75]  *Id.* at 2-3.

[76]  *Id.* at 5.

[77]  *Id.* at 10.

7 AAC 07.025 was amended to include subsection (c)'s prohibition on waiving a methodology.

Kahtnu Ventures concerns a later application for a certificate of need to build a surgery center.[78] The Department recommended the commissioner deny the application because it failed to demonstrate a need for additional capacity under the standard methodology, outline the cost and size of the project, or define its service area.[79] After the commissioner denied the application, Kahtnu Ventures appealed to an ALJ who agreed the denial should be upheld because the applicant failed to "meet its burden of dislodging the need calculation."[80]

Kahtnu Ventures then appealed to the superior court and challenged subsection (c)'s prohibition on waiving a methodology.[81] The superior court upheld the regulation as within the agency's discretion to promulgate.[82]

Maple Springs argues that these cases reveal the Department's intent that applicants be restricted to demonstrating need only by means of the prescribed methodology. We disagree. While they may reveal the Department's intent that an applicant calculate need by means of a required methodology, neither case addresses the Department's authority to waive a review standard. In fact, the commissioner's decision in South Anchorage acknowledged that it was the Department's intention that

---

[78] Kahtnu Ventures, OAH No. 12-0123-DHS at 1 (Alaska Super., June 18, 2014), https://aws.state.ak.us/OAH/Decision/Display?rec=1965.

[79] Id. at 3.

[80] Id. at 2-4.

[81] Id. at 2, 10.

[82] Id. at 11-12.

it retain its discretion to allow exceptions to the review standards.**83** These cases show only that the Department did not exercise its discretion to waive a review standard.

The Department and Aspen Creek also provide two examples of the Department issuing a certificate of need following consideration of alternative methodologies. In the first example, Mat-Su Regional Medical Center was issued a certificate of need despite its failure to apply the methodology correctly. The Department exercised its discretion to issue a certificate based, in addition to the specific review standards, on the commissioner's observations that there was a need for more medical-surgical beds and no other provider nearby that could accommodate the additional beds.

In the second example, Alaska Regional Hospital was issued a certificate of need even though the methodology did not identify the required need for the additional acute psychiatric care beds it proposed. The Department recommended approval anyway because it found that the additional proposed beds would "allow Alaska to make gains towards the national [bed] average."

The Department's analysis in each case acknowledged that the applicant failed to satisfy the review standard's definition of need under the prescribed methodology, but recommended approval based on a more holistic review of each application. The Department's decision on Alaska Regional Hospital's application directly supports the Department's argument that it previously interpreted its regulations as allowing it to issue a certificate even when the standard methodology calculation did not show a need as defined by the review standards.

The Department's interpretation of the regulations in this case is a commonsense one because it was not unforeseeable, expansive, or inconsistent with its

---

**83**    *South Anchorage*, OAH No. 06-0152-DHS at 4-5 (Alaska Super., July 2, 2008), https://aws.state.ak.us/OAH/Decision/Display?rec=1960.

prior actions. It was therefore not subject to formal rulemaking procedures under the APA.

### D. The Department Had A Reasonable Basis For Its Decision.

Whether an application meets the Department's review standards is a question necessarily implicating the agency's technical expertise to evaluate often complex mathematical justifications for a proposed healthcare facility.[84] The Department's review consisted of more than twenty pages of analysis. While it acknowledged that Aspen Creek's CASU equation calculations failed to identify a 40-bed deficit, it listed three otherwise compelling reasons that it felt justified approving the application. First, the new facility's location was in midtown Anchorage, an area far from existing skilled nursing facilities. Aspen Creek's facility also had the potential to increase healthcare accessibility in Anchorage and beyond because Anchorage is a healthcare hub for rural communities. And finally, Aspen Creek planned to provide sub-acute care which was not offered elsewhere in the state.

The regulations allow the Department the discretion to recommend approval of an application under these circumstances.[85] The listed reasons provided the Department with a reasonable basis to approve Aspen Creek's application for a certificate of need.[86]

---

[84] *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014) ("We apply the reasonable basis standard to questions of law involving 'agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions.' " (quoting *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011))).

[85] *See* 7 AAC 07.025(b).

[86] Likewise, we reject Maple Springs's argument that the Department's decision should be reversed because it failed to support its approval with a sufficient explanation. The Department may not have explicitly stated that it was relying on its discretion to waive a review standard in its analysis, but its path is "reasonably clear" from its discussion about the need for a skilled nursing facility like the one Aspen Creek

## V.      CONCLUSION

The superior court's decision is AFFIRMED.

---

proposed.  *See Radebaugh v. State, Dep't of Health & Soc. Servs., Div. of Senior & Disabilities Servs.*, 397 P.3d 285, 294 (Alaska 2017).  Furthermore, the Department's regulations only require the commissioner to provide "a written statement of the reasons for [its] decision" if the decision is inconsistent with the Department's recommendation. *See* 7 AAC 07.070(d).  That was not the case here.